(Nos. 14702-14703.—Decrees reversed and decree here.)
THE CHICAGO TITLE AND TRUST COMPANY, Receiver, Appellant, *vs.* THE CENTRAL TRUST COMPANY OF ILLINOIS, Appellee.—THE CHICAGO TITLE AND TRUST COMPANY, Appellee, *vs.* THE CENTRAL TRUST COMPANY OF ILLINOIS, Appellant.

*Opinion filed April 14, 1924—Rehearing denied June 12, 1924.*

1. APPEALS AND ERRORS—*when appeal from the Appellate Court must be dismissed.* The filing in the Supreme Court of a transcript of the proceedings of the circuit court with reference to the filing and dismissal of a cross-bill, together with the record and opinion of the Appellate Court affirming the order of dismissal, and an assignment of errors setting forth matters wherein it is claimed the Appellate Court erred in affirming the order of the circuit court, does not give the Supreme Court jurisdiction of the purported appeal and it will be dismissed.

2. BANKS—*extent of liability of trust company furnishing cash to enable new bank to evade statute.* A trust company which temporarily furnishes an amount of cash to enable a new State bank organized to take over the business of a national bank to evade the statute requiring capital stock and surplus to be paid in in cash, is liable to the receiver, in case of the failure of the new bank, to the extent of the deficiency of the capital and surplus or the deficiency in the cash value of the assets of the national bank for banking purposes at the time the money was furnished, but it is not liable to the stockholders, nor for losses due to failure of the bank's officers to use diligence in collecting loans.

3. SAME—*meaning of the word "loans."* The word "loans," referred to as a part of the resources of a bank in an accounting of its assets and liabilities, means all bills receivable and bonds and securities held by the bank.

4. SAME—*when debts or loans should be regarded as good assets in an accounting.* In determining the liability of a trust company which furnished cash to enable a new State bank to be organized to take over the business of a national bank without having its capital and surplus fully paid in, the loans and debts due the national bank must be regarded as good assets if amply secured or if the debtors were solvent on the date the liability in question was incurred, whether or not they subsequently became insolvent, and any debts actually paid at any time must be regarded as having been good on the date in question, no matter by whom paid.

5. SAME—*partial payment on note does not reduce indebtedness unless interest is paid.* In an accounting of the assets of a bank, partial payment on a note or loan cannot be regarded as reducing the total indebtedness to the amount of the payment unless the interest on the note is paid up to the date of the payment.

6. SAME—*what is meant by surplus and undivided profits.* In an accounting of the assets and liabilities of a bank, surplus represents a permanent liability carried on the books and which is rarely ever decreased or increased except in case of a loss or in case of an increase by reason of a new declaration of a permanent fund so designated, and undivided profits are the funds usually drawn on to pay the declared dividends of the bank.

7. SAME—*when former stockholders are not to be regarded as creditors of new bank.* Where a national bank ceases business and is changed into a State bank, which accepts all assets and liabilities, stockholders of the national bank who refused to take stock in the new bank in exchange for their old stock are not to be regarded as creditors of the new bank, nor is their assignee of such stock entitled to be rated as a creditor; and the liability of the new bank to the assignee and to all other stockholders who accepted stock in the new bank in exchange for their shares amounts to nothing until all the creditors of that bank are satisfied.

8. SAME—*when books of bank are admissible in an accounting.* In an accounting to determine the deficiency of the cash value of the assets or capital and surplus of a national bank whose assets and liabilities were taken over by a newly organized State bank, the books of the national bank are admissible in evidence to establish *prima facie* that certain drafts or other items were paid in the regular course of business.

9. SAME—*good will may be transferred as an asset upon liquidation.* In an accounting to determine the value of the assets of a national bank at the time its assets and liabilities were taken over by a newly organized State bank, good will should be regarded as an asset of the national bank, which, upon the liquidation or winding up of its affairs, may be transferred as a species of property.

10. DEBTOR AND CREDITOR—*when action may be maintained on a promise to pay another's debt.* A third party may maintain an action on a promise made to another for his benefit, and a bank may maintain an action on a promise of one party, for a consideration, to pay the debt or note of another.

11. SAME—*general rule as to application of payments.* The debtor has a right to have his payment applied to his indebtedness as he directs, but if he makes no direction the creditor may apply the payment as he sees fit, provided no third party is unjustly prejudiced.

12. ACCOUNTING—*good will should be regarded as an asset in valuation of business concerns.* Good will should be regarded as an asset in an accounting of the valuation of business concerns, where such concerns have continued for a sufficient length of time to have acquired a profitable and substantial list of patrons, whose patronage is necessary to the success of the business.

13. SAME—*when findings of master and of trial court will not be disturbed.* The Supreme Court will not disturb the findings of the master and of the trial court in a case involving an accounting and consideration of numerous items unless such findings are shown to be manifestly against the weight of the evidence or unless a clear mistake or fraud is shown.

APPEAL from the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

HIRAM T. GILBERT, for the Chicago Title and Trust Company.

ALBERT FINK, for the Central Trust Company of Illinois.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Some of the questions involved in this appeal have heretofore been considered by this court in the case of *Golden v. Cervenka,* 278 Ill. 409. A sufficient statement of the pleadings of the parties on the present appeal and the history of the litigation are to be found in the former decision of this court. As in that case stated, the original bill of John F. Golden and the Importers and Manufacturers' Company, as amended and supplemented, was a bill to enjoin the prosecution of the suits against the stockholders of the La-Salle Street Trust and Savings Bank, (hereafter referred to in this opinion as the trust and savings bank,) brought by one Cervenka, and the institution or prosecution of other suits of like character to ascertain the creditors of the bank and its liabilities, as well as its stockholders and the extent

of their liabilities to the creditors, for a decree for the amount of the stockholders' liability and the distribution of such amount among the creditors of the bank and for the appointment of a receiver to collect such amount from the stockholders. The receiver, William C. Niblack, appointed by the court under the bill previously filed by the State Auditor, after filing his answer filed a cross-bill containing the same allegations and asking the same relief as was asked in the original bill, a part of the relief asked being a decree against the Central Trust Company because of certain of its acts in connection with the organization of the trust and savings bank. This cross-bill was answered by the Central Trust Company, as well as the original bill. On the hearing as the case then stood in the circuit court a decree was rendered against the Central Trust Company for $1,487,854.16, and against the stockholders for an amount equal to the par value of the respective shares of stock held by them. That decree was reversed by this court. For the reasons stated in the case cited aforesaid, this court held that the act of the Central Trust Company in allowing the Auditor to count $1,250,000 of its money as the money of the trust and savings bank and as its cash capital and surplus upon which to start its business as a bank, and thereby inducing the Auditor to issue his certificate of authorization to the trust and savings bank to conduct its banking business, estopped the Central Trust Company, as against all persons giving credit to the trust and savings bank, to deny that that money was the money of the trust and savings bank and for the purposes of the bank in the due course and transaction of its business as a bank. In other words, the sum of money aforesaid was a trust fund for the benefit of the creditors in satisfaction of all their losses by reason of the acts of the Central Trust Company aforesaid and its subsequent withdrawal of that money from the trust and savings bank. A number of authorities were cited by this court in that case sustaining the court in that holding, and

that decision is not only the law of that case but is also the law of the case now in hand. We further decided in that case that if the entire assets or resources of the LaSalle Street National Bank (herein referred to as the National Bank) assigned and turned over to the trust and savings bank as assets and as capital and surplus were equal to the amount in value at which they were carried on the books of the National Bank, then the capital stock and surplus of the National Bank would not be impaired, but if the capital stock and surplus of the National Bank were impaired at that time the Central Trust Company was liable to the creditors of the trust and savings bank to make good the deficiency, and also for the interest on such deficiency from the time of demand upon it or from the time the receiver, Niblack, filed his cross-bill, which was September 24, 1915, and that the receiver could maintain that suit for the creditors. It was also decided in the same suit that the stockholders of the trust and savings bank were also liable to the creditors of the bank under the original bill brought in the former suit but that their liability was different from and had no relation to the liability of the Central Trust Company to receiver Niblack for the creditors, and that the issues in the two suits, the one against the Central Trust Company and the other against the stockholders, should be separated for the purposes of trial and upon remandment by this court should be referred to different masters in chancery for the reasons stated in our former decision. We also held in that decision that the Central Trust Company was only bound to account to the receiver for the benefit of the creditors of the trust and savings bank and that there was no liability on its part to the stockholders; that the trust and savings bank, by the action of the Central Trust Company and the stockholders and officers of the trust and savings bank, was only provided with a capital stock and surplus by the assets of the National Bank assigned to it, and that if those assets fell short of $1,250,000 in value, (the amount with

which the trust and savings bank was to begin its business as capital and surplus,) the creditors, by the receiver, have the right, to the extent of the deficiency, to complain of the Central Trust Company and of the stockholders and to require them to make good the deficiency. We also said in that case: "Whether or not this amount [the capital and surplus] had been impaired depends upon the collectibility of the loans which constituted a large part of the resources of the bank." The word "loans" in that sentence, as used by this court, means all bills receivable and bonds and securities held by the bank, and it is important in this consideration to have an accurate understanding of the holdings of this court and the law of the case as set forth in our former decision.

We have gone into the details of our former decision because of the fact that in the consideration of the case now before us many of the same points that were decided in that case are re-argued and the correctness of the holdings are thereby challenged. We are satisfied with our rulings in that case as above explained and do not deem it necessary to further consider them. Most of the propositions of law contended for by the parties to this suit are discussed in the beginning parts of their briefs and arguments. Some of them we may have occasion to consider in connection with the items of account to which they are applied, but we make the distinct point here that the law of the case now in hand, so far as announced in our former decision, is still the law of the case, and our former decision must be taken as a complete answer to all arguments against its correctness.

After the cause was remanded to the circuit court of Cook county by our former decision, the Central Trust Company on October 19, 1917, filed a cross-bill and on April 29, 1918, its amended cross-bill, making the stockholders and others parties defendant thereto, in which it made claim that "in equity the stockholders of the trust and savings bank ought to make good its capital and surplus and ask-

312—26

ing that they be required to pay whatever amount the trust company should be held liable for and to thus exonerate it in the premises, and that if prior to such payment on the part of the stockholders any part of such liability should be satisfied by the trust company, the stockholders be required to reimburse the trust company therefor." On April 29, 1918, the circuit court entered an order striking the cross-bill from the files on motion of William C. Niblack, as receiver, on the ground that it did not state a case which entitled the Central Trust Company to any relief in the court of equity and that it could not be helped by further amendment. From the order of the circuit court the Central Trust Company prosecuted an appeal to the Appellate Court for the First District, and that court on January 28, 1920, affirmed the decree of the circuit court. It does not appear from this record that any attempt was made by the Central Trust Company, by appeal or by petition for *certiorari,* to have reviewed the decision of the Appellate Court affirming the order of the circuit court aforesaid, except that the trust company has' filed a separate transcript of the record in this court containing the proceedings of the circuit court of Cook county with reference to the filing of the cross-bill, the motion and order of the circuit court dismissing the same, and the record and opinion of the Appellate Court affirming the order of the circuit court, etc., together with an assignment of errors, setting forth in the assignment certain reasons why it claims the Appellate Court erred in affirming the order of the circuit court. It is clear from the foregoing that this court has no jurisdiction to review the order of the Appellate Court affirming the order. Nevertheless, a purported appeal from that order, entitled "Chicago Title and Trust Company, as receiver, appellee, *vs.* Central Trust Company of Illinois, appellant," and bearing our general docket No. 14,703, was docketed in this court. This appeal, by order of this court, was consolidated with No. 14,702 for hearing, the latter cause being the main cause now presented

for hearing. A motion by the receiver was allowed by this court at our June term, 1922, based upon the facts above stated, to strike from the files of this court the record in appeal case No. 14,703. The allowance of that motion virtually disposes of this appeal, and the same is now by the order of this court dismissed for want of jurisdiction in this court to further consider the same.

In pursuance of our order of remandment in the former case, the matters relating to the Central Trust Company were referred to a master in chancery to take the evidence on behalf of the respective parties and to determine the assets of the National Bank assigned to the trust and savings bank and their cash value for banking purposes, and also to determine the liabilities of the National Bank assumed by the trust and savings bank. This reference was under the cross-bill of the receiver, Niblack, in the former suit, which is treated in this case as an original bill, and also the answer to the cross-bill by the Central Trust Company and the replication thereto. The original bill in the former suit against the stockholders and others, and their answers thereto, were treated as another and distinct part of the suit, and the issues thus formed were referred to another and different master and have no connection with the matters now before this court and no further reference thereto will be made. The master reported the evidence to the court with his conclusions, holding that the Central Trust Company, appellee in this proceeding, was liable to the receiver, the Chicago Title and Trust Company, appellant, for the creditors, in the sum of $79,198.42, with interest thereon at five per cent per annum from September 24, 1918. Objections to the master's report were overruled and stood as exceptions before the circuit court, which were also overruled. A decree was entered by the circuit court against the Central Trust Company in the sum of $101,691.05, including the interest, and for costs of suit. On appeal to the Appellate Court for the First District the second branch

of that court modified the decree of the circuit court and as modified affirmed the decree in the sum of $978,029.11, including interest, and it was further decreed by the Appellate Court that the Central Trust Company pay the costs in both the circuit court and in the Appellate Court. During the pendency of the suit in the circuit court the receiver, Niblack, died, and the Chicago Title and Trust Company was appointed in his stead and prosecuted the appeal to the Appellate Court. It has prosecuted a further appeal to this court, and makes the claim that the evidence taken before the master showed that the capital and surplus of the National Bank on October 21, 1912, were entirely lost. The Central Trust Company's claim is that the evidence in the record shows that on October 21, 1912, there was no impairment of the capital and surplus of the National Bank, and it has assigned cross-errors on this appeal.

The questions involved in this appeal are in the main very simple, and the action in the circuit court may be properly characterized as a bill for an accounting to determine the liability of the Central Trust Company to the Chicago Title and Trust Company, as receiver and appellant, for the benefit of the creditors of the trust and savings bank. To determine this liability it was necessary to ascertain the cash value of the entire resources or assets of the National Bank and the entire liability of that bank on October 21, 1912, the day on which the National Bank was denationalized and its assets turned over to the trust and savings bank and its liabilities assumed by the trust and savings bank. The difference between the value of the resources of the National Bank and the liabilities of that bank on said day, when properly stated and valued, must necessarily be the liability of the Central Trust Company, as that difference would necessarily show the amount of the depreciation, if any, of the assets of the National Bank, which would also constitute the amount of the liability of the Central Trust Company, hereinafter referred to as appellee.

The record in this case is very voluminous and consists of 13,571 typewritten pages. The master's report contains 525 printed pages and the opinions of the Appellate Court 337 pages. The printed abstracts contain 4176 pages, not including the index, in a special volume of 191 pages. The appellant's brief and argument and its reply contain 771 pages and appellee's brief 699 pages. There are a great number of items constituting the assets or resources of the National Bank, and more than 200 of them are contested in the printed briefs and arguments. The three Appellate Court judges all differed in their findings as to the amount of the impairment of the capital stock and surplus of the National Bank. The presiding justice, who wrote the opinion of the court, reached the conclusion that the amount of such impairment was $737,220.54. Another one of the justices, who disagreed with the presiding justice only as to three items of assets and two items of alleged liabilities, reached the conclusion that such impairment amounted to $597,411.94. The other judge reached the conclusion that the capital stock of the National Bank was worth $72,520.06 less than nothing, and that the bank was insolvent and that the capital stock and surplus were impaired to the extent of $1,250,000, which amount he fixed as the liability of appellee, with five per cent interest thereon from September 24, 1915, while the master and the circuit court fixed the amount of such impairment at $79,198.42.

Early in our consideration of this case it became very apparent that we could not sustain the judgment of the circuit court or of the Appellate Court, or the findings of the master or any member of the Appellate Court, as to the amount of the liability of the Central Trust Company, because of the fact that their findings were against the manifest weight of the evidence. Our finding on that question as to the amount does not differ very materially from that of the master and the circuit court, but there are quite a

number of the contested items in which our judgment differs radically from that of the master as well as from the different members of the Appellate Court, and the reasons therefor will later appear. We have given due consideration to the evidence in the record on the contested items, and also to the opinion of the Appellate Court and the two dissents on particular items of the account, and to the briefs and arguments of counsel. Wherever a debt to the National Bank has been paid in full, either to the trust and savings bank or to the receiver after the closing of the bank, and without any outlay to the bank or to the receiver for attorneys' fees or other extra expense in collecting the same, we have allowed the claim in full, no matter by whom paid. The main business of a bank is loaning money at interest for profit, and if a debt is paid in full, every object for banking purposes is realized out of that asset if paid in full without unnecessary expense. There is simply one good and sufficient reason for our ruling in this matter, and that is the simple fact that the receiver, for the creditors, is not entitled to a double satisfaction of any debt, and a debt paid by an honest poor man who pays because he is honest is worth just as much to the creditors as the debt of a millionaire who pays because he is solvent, provided the debts are the same amount. We regard it also as true that a debt paid by a rascal, if such appears in the evidence, is just as good money to the creditors or to the receiver as the money of any other man, and one satisfaction is all they are entitled to or should demand.

There are instances in this record where certain debtors did not pay their debts either to the bank or to the receiver and were shown to be insolvent when the debts came into the hands of appellant. Wherever the evidence in such cases shows that the debtor was solvent and the debt collectible on October 21, 1912, that debt we also regard as a good asset on this inquiry and one that should be allowed in full. The question in such a case, as was stated in our

former opinion, is not as to the collectibility of the note when it came into the hands of the receiver, but as to its collectibility when it came into the hands of the trust and savings bank. The Central Trust Company in this case is not to be prejudiced by any failure of the trust and savings bank, or by appellant, to use proper diligence in the collection of the assets turned over to them. If the debt was as good on that day as cash for banking purposes, we regard it as a good debt and have allowed it. It was this ruling that we made in the former case that is used by appellant in its contention that all debts, whether they have been paid or otherwise, must be determined as to their worth on October 21, 1912. This very argument has occasioned the great difference in the finding of one of the Appellate Court judges and the other two judges, the holding of the dissenting judge in many instances being to the effect that the debt should be regarded as worthless although paid, because of the fact that there was no evidence tending to show that it was good and collectible when it came into the hands of the trust and savings bank. The receiver has also taken the position in some instances in this case that a debt of a debtor is not to be regarded as a good asset in a bank for banking purposes unless the trust and savings bank could have re-discounted that note to another bank had it attempted to do so. We do not regard such proof necessary in this case, but the simple question is, Were the assets collectible in the ordinary course of business, principal and interest?—and if so, we have regarded the assets as good and worth full value for banking purposes because they have served the purposes of the bank in reaping a profit on them by collecting the principal and interest. No bank would discount any paper for cash without a profit on the cash invested in the purchase. This court never meant to indicate in its former decision that a debt paid was not to be regarded as a good and collectible asset. Payment of such an asset is the very best evidence that it was good, and

where a note is paid it is immaterial whether or not another banker would have discounted it for cash or otherwise, or whether or not it was good or bad within the judgment of bankers on October 21, 1912.

. The expert accountants, in listing the resources or assets of the National Bank, have not listed them at their face values in many instances, as such face values appear in the original instruments. This is notably true of bills receivable. The face value of all notes for the purpose of this accounting the experts valued as of October 21, 1912. In those instances in which the face of the original note was drawing interest to a date after October 21, 1912, the value for this accounting is the face value of the note plus accrued interest to said date, following the methods of the experts in this particular; and in the case of other notes in which their faces express the principal and interest for a given time after October 21, 1912, their due date, the face values of those notes we give at face, less accrued interest, and for the same reason. So, if in our accounting we find a note to be worthless, the total loss or depreciation of assets for that note is its face value less its accrued interest or plus accrued interest, according to the class to which it belongs, and if we find the note good and collectible we allow it for its face value less accrued interest or plus accrued interest, according to the class to which it belongs. On a number of notes contested in this record only part payment was made and the remainder of the notes was held to be worthless. In all such instances the value of the notes for banking purposes is not the amount of the payments on the notes but the present worth of the payments on October 21, 1912, unless interest was also paid to date of the payments. In other such instances payments are made, and at the date of the payments all interest on the notes was paid up to the date of the payments. In such cases the payment or payments represent a complete discharge of the debt to the amount of the payments, and the note or notes would in

such cases be worth the amount of the payments or the total amount of the debt discharged, with interest, if the debtors were insolvent and the notes not collectible. In still other instances payments were made on other notes, and also interest on them up to a certain date prior to the last payment. In such cases the amount of the payments made up to the time the interest was paid in full discharged completely the amount of the debt to the extent of the payments, and payments thereafter made are accounted for at present value from the time the interest was completely paid on the note to the date of the payments, to ascertain the full amount of the debt discharged by such latter payments. The reasons for our action in this regard are, that a partial payment on a note or claim cannot be regarded as the same as cash in the trust and savings bank except to the extent that that note or claim is completely discharged as to both principal and interest. There will be found in our accounting a number of instances in which we have allowed less on notes on which partial payments have been made than either the master, the circuit court or the Appellate Court. We make all the foregoing explanations in this part of our decision so that our accounting may be understood without going into details in every instance when we come to our consideration and explanation of particular items passed on by us in this accounting. In counting present worth or value as to partial payments made we have used the rate of six per cent per annum.

In the following tabulations we give the itemized resources or assets of the National Bank turned over to the trust and savings bank and our valuations of the same, and also a complete list of the liabilities of the National Bank assumed by the trust and savings bank, together with the total values or amounts of such resources and liabilities as we have found them, and the difference between the same, which is our finding as to depreciation of the assets of the National Bank and also for that reason the liability of the

Central Trust Company to appellant on September 24, 1915, the date of the filing of the cross-bill, to-wit:

RESOURCES

|  |  |  |
|---|---|---|
| 1. | Cash in bank | $231,555.91 |
| 2. | Exchange for clearing house | 47,386.36 |
| 3. | Redemption fund in U. S. treasury | 32,500.00 |
| 4. | Due from national banks | 313,305.46 |
| 5. | Due from State banks | 151,010.01 |
| 6. | Accrued int. on amt. due from Nat. and State banks | 206.09 |
| 7. | Cash items | 426.88 |
| 8. | Overdrafts | 3,265.92 |
| 9. | U. S. bonds to secure circulation | 659,663.25 |
| 10. | Bonds to secure postal savings deposits | 78,409.76 |
| 11. | Other stocks and bonds | 191,572.52 |
| 12. | Furniture and fixtures | 5,950.00 |
| 13. | Loans and discounts | 2,299,274.27 |
| 14. | Funds in transit | 305,247.32 |
| 15. | Account new bank building | 50,000.00 |
| 16. | Good will | 65,000.00 |
|  | Total | $4,434,773.75 |
|  | Liability of appellee to balance | 108,055.78 |

LIABILITIES

|  |  |  |
|---|---|---|
| 1. | Capital stock | $1,000,000.00 |
| 2. | Surplus | 250,000.00 |
| 3. | Individual deposits | 1,852,969.64 |
| 4. | Accrued interest on individual deposits | 941.51 |
| 5. | Savings deposits | 109,903.36 |
| 6. | Accrued interest on savings deposits | 720.00 |
| 7. | Postal savings deposits | 58,011.89 |
| 8. | Accrued interest on postal savings deposits | 425.05 |
| 9. | Due national banks | 192,886.52 |
| 10. | Due State banks | 200,768.70 |
| 11. | Accrued int. on amt. due Nat. and State banks | 468.96 |
| 12. | Time certificates of deposit | 98,727.50 |
| 13. | Accrued interest on time certificates of deposit | 683.78 |
| 14. | Demand certificates of deposit | 4,000.00 |
| 15. | Accrued interest on demand certificates of deposit | 6.01 |
| 16. | Marginal certificates of deposit | 27,500.00 |
| 17. | Accrued interest on marginal certificates of deposit | 15.79 |
| 18. | Cashier's checks | 41,461.93 |
| 19. | Certified checks | 50,440.32 |
| 20. | Expense vouchers | 39.25 |
| 21. | Circulation | 647,495.00 |
| 22. | Circular expenses | 2,109.89 |
| 23. | Certain liabilities not shown on the books | 3,254.43 |
|  | Total | $4,542,829.53 |

It has occurred to us that we can better make ourselves understood in this accounting by first considering the liability side of the account we have just stated, although it may seem like considering the matters somewhat out of their natural order.

In all well regulated banks, whether State, national or private, in which their books are properly kept, the assets and liabilities as carried on their books exactly balance. The liabilities to stockholders are generally, and we think universally, placed at the head of the tabulations representing the liabilities of the bank, although in case of dissolution and winding up of the affairs of any of the banks aforesaid, for whatever cause, the stockholder is the last to receive consideration in the distribution of the proceeds realized from the asset side of the account. Generally three terms are used to express this liability to stockholders: First, capital stock; second, surplus; and third, undivided profits. The item designated as "surplus" represents permanent surplus or a liability that is carried permanently on the books and is rarely ever decreased or increased except by necessity, in case of a loss to the bank or in case of an increase by reason of a new declaration of a permanent fund to be carried under that designation. The undivided profits are the funds usually drawn on to pay the declared dividends of the bank. The term "capital stock" requires no explanation. The liabilities other than capital stock, surplus and undivided profits carried on the books, represent, of course, the amount of liabilities owed to the real creditors of the bank by the bank, and by the stockholders as well, under such laws as ours, where stockholders are bound to the creditors in a double liability in case of insolvency, etc. The National Bank carried on the liability side of its account capital stock and surplus in the same amounts that we have above listed on the liability side of our account in this case. It also carried on that side of the account undivided profits to the amount of $17,815.72. We have omit-

ted this last named item from the liability side of our account for two reasons. In the first place, the liability of the Central Trust Company in this case, as we have already declared it, was simply to make good the capital stock and surplus of the trust and savings bank, amounting to $1,250,000. If the assets of the National Bank would pay off its entire liability to its real creditors and leave $1,250,000 for its stockholders, its capital stock and surplus transferred to the trust and savings bank would not have been impaired for the purpose of this accounting, because its entire assets transferred to the trust and savings bank would upon such supposition be worth in cash the amount due both creditors and stockholders. It must therefore be clear that for the purpose of this accounting the liability side of our account should not contain an item of undivided profits. The second reason for not including it is the fact that the National Bank did not have the amount of undivided profits carried on its books that was backed or secured by good and collectible assets above its other liabilities as listed by us. In making up the liability side of its account in this case the Appellate Court omitted the items of capital stock and surplus. We think that this is one of the causes that led it into error in its consideration and reasoning as to other items of the liability account which the attorney urged on the part of the receiver should be included on that side of the account. It seems to us that a moment's reflection ought to convince anyone that we have included on the liability side of our account every liability to stockholders, but we will now proceed to consider other such items which it is urged by the receiver should go into the account, and only very briefly, because the questions are so simple.

As was disclosed in our former opinion, there were a number of stockholders of the National Bank who were not willing to, and did not, exchange their National Bank stock for shares of the trust and savings bank. The receiver insists there should be included on the liability side

of the account an amount necessary to settle with those stockholders. There were 426 shares held by such stockholders, and two members of the Appellate Court have charged up in this accounting $53,250, or $125 per share. The other member of the Appellate Court reduced this amount to $21,202.02, and all of them treated these stockholders as creditors, simply. These stockholders are not to be considered at all as creditors of the trust and savings bank and entitled to share in the proceeds of what the receiver shall realize out of the assets of the trust and savings bank, and neither is their assignee of these shares entitled to be rated as such a creditor. This record shows, without dispute, that C. B. Munday purchased the shares of the dissenting stockholders at about $125 per share and thereby canceled all claim against the trust and savings bank as to those creditors, and it will certainly not be urged that Munday, as their assignee, has any standing as a first creditor of the bank. There is no more reason for considering or treating the amount due said stockholders as an extra item in the liability account, than there is for considering any other stockholder of the National Bank as a creditor to the extent of the value of his stock and who exchanged his National Bank stock for stock in the trust and savings bank. Under the evidence in this record there is no liability of the Central Trust Company, and could be no liability, to stockholders of the National Bank, or their assignees, on account of the fact that they held such stock at any time. It will be noticed that we carry the entire amount of liability to the stockholders of the National Bank ($1,250,000) in the first two items of our liability account. That liability as to said stockholders ceased the very moment they accepted stock in the trust and savings bank, and as to the dissenting stockholders the very moment that Munday purchased their stock. The liability as to these latter stockholders passed to Munday when they assigned their shares to him, and this liability is a liability of the trust and sav-

ings bank, which amounts to nothing until all the creditors of that bank are satisfied. The liability of the Central Trust Company is to creditors of the trust and savings bank to make good the $1,250,000 of capital stock and surplus of the National Bank assigned to the trust and savings bank. We therefore place as their liability $1,250,000 for these two items, and after satisfying all the other creditors on the liability side of the account out of the assets, if the remainder is less than said liability the actual liability is the difference, and nothing more. So in reality the entire liability of our side of the account, so far as this accounting is concerned, is a liability of the Central Trust Company to the creditors of the trust and savings bank, and never can become a liability to the stockholders of the trust and savings bank, assignees of the stockholders of the National Bank. The assets of the Central Trust Company for the purpose of this accounting are represented on the side of the account which we have headed "Resources." In other words, although they were the assets of the National Bank on the day it assigned them to the trust and savings bank, they are now to be considered as the assets of the Central Trust Company for this accounting, to pay off the liabilities on the other side of the account. The amount that such resources are insufficient to satisfy the liabilities is the amount that the Central Trust Company shall pay from its own bank to satisfy such liabilities.

For similar reasons mentioned in the preceding paragraph there is no liability of the Central Trust Company for the taxes assessed against the individual stockholders of the National Bank on their stock, amounting to $12,182.24. The National Bank, apparently as all other national banks usually do, was accustomed to pay the taxes of its stockholders on their National Bank stock. The reason for this custom in this State is apparent. By section 35 of our Revenue law the stockholders of the bank are personally assessed for their shares, and, of course, are primarily liable

therefor and bound to pay the same.  By section 39 of the Revenue act it is the duty of every bank and its managing officers or officer to retain so much of any dividend or dividends belonging to such stockholders as shall be necessary to pay taxes levied upon the stockholders' stock.  The officers of the bank are personally made liable for these taxes if they do not conform to section 39 in paying the tax out of the stockholders' dividends.  Accordingly the National Bank on October 21, 1912, carried an item in its liability account in this language: "Reserved for taxes, $6000." That sum was almost one-half of the taxes, and if the National Bank had continued in business it is probable that this item would 'have been doubled or fixed at the amount of the taxes at tax-paying time after it had ascertained the correct amount.  The trust and savings bank paid a dividend in 1913, and should have deducted this tax from that dividend just the same as would the National Bank have done had it been in business at tax-paying time and at the time of the declaration of the dividend in 1913. This liability was clearly a liability of the stockholders of the National Bank.  Because the National Bank took steps to protect itself against liability for said taxes, and also its officers, in the manner above stated, the taxes did not become its obligation primarily.  The Central Trust Company is under no obligation to pay the taxes of the stockholders of the National Bank.  The trust and savings bank assumed no obligation to pay such taxes.  Its contract was that it would "assume all the indebtedness of the National Bank of every kind and agree to pay such indebtedness in the manner and form in which the National Bank agreed to pay the same."  There is no proof of any special agreement to pay these taxes, as the trust and savings bank was only under obligation to the State to pay these taxes, as the National Bank would have done, out of the dividends of the stockholders.  Two of the Appellate Court judges erred in including in the liability account of the Central

Trust Company $6000, the amount carried on the books of the bank and reserved to pay taxes. The mere fact that this item was carried on the liability side of the account of the National Bank did not make it a real obligation of the bank and consequently not an obligation of the Central Trust Company.

The receiver makes the further claim that the expenses in carrying on the trust and savings bank from its organization to its close were $316,104.17, and that the total expenses of the receiver were $274,170.45, making a total of $590,274.62, which should be considered as a liability of the National Bank and as a liability of the Central Trust Company. We think the mere statement of this claim ought to be sufficient to refute its correctness. No reasonable theory is advanced or can be advanced for charging these amounts in the liability account of appellee. Appellee cannot be charged for any mismanagement of the bank or for the expenses of the receiver in winding up its affairs, because it was in no way responsible for the same.

The master and the circuit court, and also the Appellate Court, have charged appellee in its liability account a $500 fee paid to Joseph O. Morris for legal services rendered by him prior to October 21, 1912, to the National Bank on a claim placed in his hands by that bank. It was paid to him by the trust and savings bank on November 30, 1912. At that time Morris owed the National Bank a $600 note due on demand. The trust and savings bank, had it seen fit to do so, could have set off this $500 claim with Morris' note, and should have done so. Morris also owed the National Bank another note, which made his total indebtedness on October 12, 1921, $2079.45, and we have allowed nothing on this claim against Morris. We do not dispute the propriety or correctness of the courts in charging this on the liability side of the account, but the Appellate Court erred in not crediting a like amount on the debt of Morris to the bank for reasons aforesaid. We have disregarded

this item as charged for the reason that we would simply have to give credit on the other side of the account and reduce Morris' indebtedness to the bank that much.

It appears from the evidence that C. B. Munday, after the close of the trust and savings bank, made a claim against the trust and savings bank in his bankruptcy schedule for $20,125 as salary due him as president of the National Bank. It further appears from the evidence that he received payment on his salary up to December 31, 1910, and that he thereafter relinquished his salary and made no further claim therefor until after the close of the trust and savings bank. Our conclusion is that the master and the Appellate Court both properly refused to charge said sum as a liability in this accounting.

We also think that the master and the Appellate Court properly refused to charge as a liability in this accounting the claim for the unexpired term of the lease of the Rookery building by the National Bank, and which claim the receiver alleges amounts to $211,500.03. Both the master and the Appellate Court declined to allow this claim of the receiver on the ground that the trust and savings bank was substituted as lessee in lieu of the National Bank, and that the lessor thereby released the National Bank from its obligation. The evidence supports that finding.

The Appellate Court properly allowed the receiver's contention that there were certain liabilities not shown on the books of the bank and estimated these liabilities to amount to $3254.43. The master charged on the liability side of the account for those items $5364.32. This action is accounted for on the part of the master by reason of the fact that he included circular expenses to the amount of $2109.89, thereby duplicating the charge for circular expenses by oversight. There is no contention that this charge is not correct as made by the Appellate Court, and we allow the same. The liability side of the account from item No. 1 to item No. 22, inclusive, as we have above

stated them, are conceded to be correct by both appellant and appellee.

In our consideration of the side of the account which we have above designated as "Resources," we will follow the same order in considering it that the Appellate Court did in its discussion. The master and every member of the Appellate Court agreed as to the amount that should be allowed for the first seven items of resources as numbered by us and also as to item 12. The evidence amply supports them upon every item, and we will make the same allowance without further discussion. For the eighth item, overdrafts, we have allowed full value, $3265.92, as did the master, for the reason that the record discloses that they were all paid, and without contradiction. The Appellate Court allowed the same except the overdrafts of William Lorimer, Jr., and Josephine Lorimer, amounting to $313.24. We will further consider this item when we come to consider two bills receivable that were paid by Lorimer at the same time that he paid the overdrafts and which were also disallowed by the Appellate Court. The master and all members of the Appellate Court found the value of the ninth item, United States bonds to secure circulation, to be the sum of $658,018.75. We are compelled to disagree with this allowance upon the testimony of C. Frederick Childs, a specialist in government bonds officing in Chicago, and of expert accountant Hawkins. Childs sold 13,000 of the Panama 2's at 101¼ on October 21, 1912. On that same date United States consols 2 per cents were offered at 101¼, and 101 1/16, plus accrued interest, was bid, and as we understand the evidence there was no sale at the latter price. Hawkins valued these bonds at 101.1875, plus accrued interest, and found the value of all of the bonds to be $659,663.25, and we have allowed the same. The master and the Appellate Court allowed for the bonds the amount they sold for about three days after October 21, 1912. For item 10, bonds to secure postal savings deposits,

the master allowed $78,434.91. We approve the finding and allowance of the Appellate Court on the evidence of Holtz and Hawkins and allow $78,409.76. The master seems to have erred in counting interest on this item.

Under the designation "Other stocks and bonds," item 11, there are a number of stocks and bonds considered: (*a*) Artesian Stone and Lime Works bonds, which we value at $79,469, which is the same value given them by the master and all members of the Appellate Court. (*b*) City of Chicago special assessment coupons we value at $3767.33, the same as did the master, because it appears from the evidence that they were redeemed at full face value, plus accrued interest, by the city in the regular course of business as they came due, and that the receiver could have realized the same for those that came into his hands had he presented them to the city for payment instead of selling them at a lower price. It is our constant holding all through this opinion that the Central Trust Company is not bound by the action of the receiver in selling any of the assets for less than their proved value when the evidence is clear that there was a want of due diligence in finding out their value. There was no reason whatever to doubt that these instruments would be paid in full when due or a reasonably short time thereafter. (*c*) Florida Indian River Land Company bonds were collected in full by the bank when they were due, plus six per cent interest. We therefore value them at $8028, being face and accrued interest, and thereby approve the master's finding. There is no dispute on the evidence. (*d*) McGuire gold bonds we value at $12,319, face value and accrued interest. The bank also sold these bonds at full face value, plus interest, according to the testimony of Kadish, and we therefore agree with the master's finding. (*e*) Rock Island Southern railway bonds were proved to have been sold in the month of October, 1912, at 94½, and just before and after that month at from 93½ to 94½. The Appellate Court valued these

bonds at 90 and the master at 70. We value them at 94, plus accrued interest, or $39,489.42. (*f*) United Gas and Electric Company bonds were valued by the Appellate Court at $19,072.23, and it is amply supported by the testimony in the record that these bonds were worth 93, the valuation placed on them by that court. (*g*) Western Stoneware Company bonds were valued by the master at $5357. The Appellate Court valued them at $5082, being the same valuation given them by the Central Trust Company's witness. We concur in the finding and allowance of the Appellate Court. There are a number of other items carried under the designation "Other stocks and bonds," the aggregate value of which is $24,345.54, which is the value given them by the master and all members of the Appellate Court. They are not contested and we value them at the same aggregate amount.

The Appellate Court has considered the loans and discounts of the National Bank in fourteen divisions or groups, and it appears from the opinion of that court that in the discussion of the loans and discounts before it the parties to this suit presented them in the same manner as the court has considered them. For convenience of the parties we will therefore consider them in the same manner, taking up each division separately.

### Division 1.

Bills receivable of J. G. Munday, the Bank of Smithboro, the People's Bank of East Alton, the Litchfield Mill and Elevator Company, John K. Seagrave, and J. K. Seagrave & Co.

C. B. Munday was vice-president of both the national and trust and savings banks during their entire existence, May, 1910, to June 12, 1914. Prior to that time he resided at Litchfield, Illinois, where his principal business had been the operation of a mill at Litchfield and the purchase and sale of grain and flour. He did a very large business in

exporting grain in addition to his local grain trade and also purchased and sold grain in Chicago and other large cities of this country. He owned elevators at Litchfield and at many other points near there, and continued to conduct his grain business during the existence of the banks. C. B. Munday & Co. was a co-partnership, consisting of C. B. Munday and his son, J. G. Munday, and carried on business at Litchfield and elsewhere. It was controlled by C. B. Munday. After the organization of the banks in Chicago this company continued under the name of J. G. Munday & Co. The Litchfield Mill and Elevator Company was a corporation organized under the laws of Illinois, with a capital stock of $200,000. Its stock was owned entirely by C. B. Munday and his family and Munday controlled its operation. The Bank of Smithboro and the People's Bank of East Alton were private banks of C. B. Munday & Co. for carrying on a private banking business at Smithboro and East Alton, Illinois. John K. Seagrave was in the employ of C. B. Munday & Co. as manager of the Litchfield Mill and Elevator Company, C. B. Munday & Co., the Litchfield Drug Company, and a business carried on under the name of J. K. Seagrave & Co. J. G. Munday appears to have had no property in his own name. All of the foregoing debts to the National Bank under Division 1 are for the foregoing reasons treated in this record as the debts of C. B. Munday, and there is no contention to the contrary. The personal indebtedness of C. B. Munday to the National Bank is treated by the Appellate Court in its Division 15 under the head of "Transit items," and under the accounting in that division Munday is charged on the liability side of his account with all the debts considered under this division. This brief explanation will serve to shorten our discussion under this and other divisions, for the reason that under our finding from the evidence in this record Munday was undoubtedly solvent on October 21, 1912, as was found by the master. The Appellate Court found that

Munday on October 21, 1912, had good assets amounting to $800,295.88, and also found that his total liabilities were $937,080.60. The court has treated him and all his concerns in the name of which he did business as totally insolvent on that date, in all its considerations of his indebtedness to the bank and to others, and, unless his indebtedness has been found by the court to have been actually paid in whole or in part, has found his debts to the bank and to others worthless, although the court found in an actual finding that his assets were about 85 per cent of his liabilities. But on the very facts considered by the Appellate Court, if we value the assets of Munday as to the particular items as the court valued them, there should be added to the asset side of Munday's account $30,235 for the notes and accrued interest of William Lorimer, Sr., secured by a mortgage on his Michigan farm, which were unquestionably good and which were actually paid by Lorimer on April 8, 1914. There should also have been deducted by the Appellate Court from the liability side of Munday's account the notes of John K. Seagrave and J. K. Seagrave & Co., which, with accrued interest on October 21, 1912, amounted to $40,611.26, because he was charged twice with these items. So under the Appellate Court's facts and valuations Munday's assets should have been found by it to have been $830,530.88 and his liabilities $896,469.34. These facts will clearly appear when we come to discuss the National Bank's claim against Munday in Division 15. Errors in book-keeping similar to the foregoing and similar conclusions of the Appellate Court account largely for the great discrepancies between the judgments of the Appellate Court and circuit court in this case. It was clear oversight on the part of the Appellate Court to reach the conclusion that Munday having good assets to the amount of more than $830,000, and which were more than 92 per cent of his liabilities, was totally insolvent and

without financial ability to pay any part of his obligations that were unpaid in whole or in part.

After considering the evidence in the record we find that all six of the debts aforesaid to the National Bank were good and collectible on October 21, 1912, and we have allowed them in the following amounts, being the notes plus accrued interest to that date, to-wit: J. G. Munday, $14,049; Bank of Smithboro, $51,474.75; People's Bank of East Alton, $16,841.90; Litchfield Mill and Elevator Company, $120,578.68; John K. Seagrave and J. K. Seagrave & Co., combined, $40,611.26; which makes a total allowance for this division of $243,555.59.

As to the indebtedness of J. G. Munday, both the master and two members of the Appellate Court have found that it was amply secured by shares of stock in the banks of Oconee, Alhambra, Marine and Bethalto, of the aggregate market value of $16,575. The claim made by the receiver is that the foregoing securities or collateral were withdrawn from the bank before October 21, 1912. The evidence amply sustains the master and the Appellate Court. This debt is treated by all parties as a debt of C. B. Munday, who was solvent on said date, and no further comments are necessary.

The first item of indebtedness of the Bank of Smithboro is referred to in the record as its indirect liability of $5034.39, which was all entirely paid in due course of business, as found by the master and as testified to by Kadish, the expert accountant who was employed by the receiver in this litigation and who was the witness of the Central Trust Company. This indirect liability consisted of a certificate of deposit of the Bank of Smithboro of the value of $3077.92 and eleven other items or notes discounted by the Bank of Smithboro, amounting to $1956.47. The witness testified that the certificate of deposit was carried as an indirect liability, possibly for the purpose of concealing its identity. As the record discloses that the paper discounted

by the Bank of Smithboro in this account, and without con-
tradiction, was paid by the direct obligors in full in the ordi-
nary course of business, we have credited the amount of
those items on the asset side of Munday's account. The
next item, the note of Fred and Bessie Ahlers, for $2007,
was discounted by the Bank of Smithboro to the National
Bank and was actually paid by them just prior to the sus-
pension of business of the trust and savings bank. It was
carried as a direct liability of the Bank of Smithboro to the
National Bank, but, in fact, was indorsed to the Bank of
Smithboro and by it to the National Bank, and as it was
unquestionably good we have also credited the asset side of
Munday's account to the National Bank with this item, as
will hereafter appear. The third item was a certificate of
deposit of the Bank of Smithboro, No. 6867, for $5125,
and was paid November 23, 1912, by charging it to the
deposit account of the Bank of Smithboro, which was at that
time $22,924.06. The next item, No. 7657, was a certifi-
cate of deposit for $10,250, which, after being renewed,
was sold to the Ashland Twelfth Bank on January 5, 1914,
and charged to the deposit account of the latter bank. It
remained a liability to the latter bank until the closing of
the trust and savings bank, June 12, 1914. The remaining
three items were Nos. 8345, 8346 and 8347, and were cer-
tificates of deposit for $5000 each. The first two of these
items, after renewals, were on April 14, 1914, sold and
transferred to the A. H. Hill & Company State Bank and
charged against the credit balance of the latter bank and
later re-transferred to the trust and savings bank and by
the latter to the State Bank of Calumet and were charged
against the credit deposit of that bank. The indebtedness
represented by these two certificates of deposit remained as
an obligation in the Bank of Calumet on June 12, 1914.
Certificate of deposit No. 8347 was renewed for $5125 and
on January 5, 1914, transferred to the Ashland Twelfth
Bank, where it remained until the closing of the trust and

savings bank. It was charged to the credit balance of the Ashland Twelfth Bank. The banks to whom the certificates of deposit aforesaid were transferred by the trust and savings bank are those known in this record as subsidiary banks, which will be discussed in a later part of our opinion. We have treated none of these notes thus transferred as paid for reasons hereinafter stated. The total amount of the indebtedness above listed to the Bank of Smithboro is $36,462.24, which amount was allowed in full by the master. Two members of the Appellate Court allowed on the total indebtedness aforesaid, indirect liability $1989.23, although the testimony of Kadish shows it all paid in due course of business. It allowed on the direct liability $17,019.51, which was paid.

Three of the certificates of deposit above discussed, and which were numbered 8345, 8346 and 8347, and three other certificates of deposit aggregating $15,012.51, including accrued interest, were all certificates of deposit issued to William Lorimer, Sr., by the Bank of Smithboro as a loan. Lorimer gave a mortgage on his Michigan farm to secure the $30,000 in certificates to C. B. Munday, which is the same mortgage heretofore spoken of and hereinafter more fully considered. This mortgage was paid, as heretofore stated, and Lorimer's indebtedness to Munday entirely canceled. Lorimer discounted the certificates of deposit to the National Bank and thereby got the money which he had borrowed. For unexplained reasons the National Bank charged three of these certificates of deposit to Lorimer and three of them to the Bank of Smithboro. Lorimer's liability was only as an indorser. All of them should be charged to the Bank of Smithboro, and in this accounting we have charged them all to the Bank of Smithboro as a direct liability, and when we come to consider Lorimer's indebtedness we deduct them from his obligations for reasons which will appear later. We have therefore allowed the debt of the Bank of Smithboro in the sum of $51,474.75 as good and col-

lectible, because it is all a direct liability of C. B. Munday. C. B. Munday & Co., as already explained, owned this private bank. It was a going concern and according to the appearances in this record a very thriving country bank from the time of the organization of the National Bank to the day it was denationalized, and continued as a going bank until the closing of the trust and savings bank, on June 12, 1914. In addition to the fact that a portion of this obligation was paid and Munday good for the remainder of it, it is clear from the evidence in this record that the entire sum could by proper diligence have been collected by the trust and savings bank long before the bank was closed, even if the Appellate Court's showing that Munday's assets only equaled a little more than 92 per cent of his liabilities on the day the trust and savings bank began business. The Bank of Smithboro is shown to have been a thriving country bank at that time and did considerable business, as already stated. There was not a breath of suspicion, so far as this record discloses, that Munday was insolvent or without ability to pay his obligations in full. On the other hand, he was reputed by his neighbors and by all the business men in the country who knew him or knew of him, to be worth at least a half million dollars above his indebtedness. He had unlimited credit, and all that the trust and savings bank would have had to have done to collect this indebtedness would have simply been to have made demand and insisted on payment when due. The appellee in this case is not to be prejudiced as to any debt considered in this record by the fact that Munday, the vice-president and managing head of the trust and savings bank, had allowed collectible debts to the National Bank to go uncollected until the trust and savings bank was finally closed for business.

The Bank of East Alton was another private bank,—a partnership composed of C. B. Munday and J. G. Munday,—and on October 21, 1912, was indebted to the National Bank on three demand notes aggregating $15,052.50,

including accrued interest, and also as indorser on eight notes of its customers re-discounted to the National Bank, aggregating $1789.40. Kadish testified that the eight notes representing the indirect liability "were cleaned up and paid in the regular and ordinary course of business," as the books of the bank showed, and that he knew of no reason why they were not good on October 21, 1912. This testimony is undisputed, and two members of the Appellate Court have given the notes representing the indirect liability full value while the third member of that court dissented and found them worthless. Two of the demand notes were renewed April 24, 1913, and were sold to the Broadway State Bank in December, 1913, and there remained, the same being charged to the deposit account of the latter bank. The third note was renewed April 24, 1913, and was sold to the State Bank of Calumet on January 5, 1914, and was charged to the deposit account of that bank. There is no showing in the record that any one of these three notes was collected or pressed for collection until after the notes came into the hands of the receiver. The further showing in the record is to the effect that the People's Bank of East Alton had on deposit with the National Bank on October 21, 1912, the sum of $2940.30, and that after that date its deposit balances in the trust and savings bank often exceeded the indebtedness it owed to that bank, and as the notes were demand notes they could have been collected by simply offsetting them against the deposit account. The sum and substance of the receiver's contention is that these notes must all be regarded as worthless because of Munday's connection with this bank and the trust and savings bank. Every member of the Appellate Court found these three notes to be worthless. We have allowed full value, as did the master. We have also credited C. B. Munday in his personal account with $1789.40, the amount of the discounted notes aforesaid, as they were his property when discounted and were unquestionably good assets, and we

have also charged him with $16,841.90, the entire amount of the three notes and the indirect liability. The notes represented by the indirect liability were, of course, paid by the makers to the trust and savings bank, as shown by its books. We will reserve further comments on this indebtedness until we consider Munday's individual liabilities.

The Litchfield Mill and Elevator Company owed the National Bank on October 21, 1912, a number of notes, aggregating $120,578.68, less unearned interest. Two members of the Appellate Court found from their consideration of the evidence that $22,009.65 of the total liability of the company had been discharged by actual payments, and they only allowed this amount of the entire debt while the other member of the Appellate Court allowed nothing. The master allowed the full value of the claim. We will not go into the full details of this indebtedness or consider the question as to how much ought to be allowed by actual payments made. We allow full value on the ground that a large portion of the debt was paid and that the remainder of the debt was good and collectible because of the fact that C. B. Munday was responsible therefor.

Both the Appellate Court and the master listed what they found to be the liabilities and assets of the Litchfield Mill and Elevator Company. We have examined the record evidence and from the same find the liabilities of this company to be the following:

| | |
|---|---:|
| Notes held by National Bank | $120,578.68 |
| Bonds sold to Rosehill cemetery | 100,000.00 |
| Notes held by Colonial Trust and Savings Bank | 40,000.00 |
| Notes held by Bank of Marine | 4,000.00 |
| Notes held by Bank of Alhambra | 3,500.00 |
| Notes held by Bank of Bethalto | 3,500.00 |
| Debt due Shearson, Hammill & Co | 19,131.25 |
| J. K. Seagrave note to National Bank | 15,654.60 |
| J. K. Seagrave & Co. note to National Bank | 24,956.66 |
| Bonds sold to Bank of Marine | 500.00 |
| Bonds sold to Bank of Bethalto | 2,500.00 |
| Total | $334,321.19 |

The master found the liabilities the same as above, except that he omitted from his list of liabilities $3000 in bonds sold to the Marine and Bethalto Banks. He also made an error of $10 in addition of the liabilities. The Appellate Court added $50,000 to the master's finding and adopted his error in addition. The evidence shows that $150,000 of bonds were authorized by the company, but only $103,000 of them were outstanding on October 21, 1912, as above shown. So far as we can ascertain from the record, the testimony of J. G. Munday in the first instance was to the effect that all of the $150,000 of bonds were outstanding, but his examination in full shows that he had no actual knowledge upon the subject and his statement a mere assumption on his part. The evidence does clearly establish the liabilities as we have above shown them, and there is no dispute as to the liabilities except on the question whether or not $47,000 of the bonds, in addition to what we have found, were outstanding.

The total assets as found and valued by the Appellate Court are the following:

| | |
|---|---|
| Physical assets | $250,000.00 |
| Flour and grain on hand | 75,000.00 |
| Bills receivable and cash in bank | 11,274.33 |
| Good will | 25,000.00 |
| Total | $361,274.33 |

In valuing the assets of this company we have adopted the views and values of the two concurring members of the Appellate Court. The witness Seagrave testified that the physical assets, not including good will, were in his judgment worth $225,000. C. B. Munday valued the property at from $240,000 to $300,000. Expert Seward, who in October, 1915, examined the property at Litchfield and all the other elevators and prepared complete statements as to the value of the physical property at that time, valued the physical assets at $259,932.03. In this valuation he included nothing for good will, and omitted the elevator at

McVey for the reason that it was not in existence at that time. He also valued another elevator in his valuation that was not in existence in 1912 but which was of less value than is given for the one at McVey. He was three weeks in making his examinations and estimates. He arrived at the value of buildings by standard methods used by engineers and architects in determining costs of buildings and equipment, making allowance for depreciation. He estimated the value of the real estate by inquiries in the neighborhood. While there is no question as to the ability of the expert, we think the Appellate Court was justified in considering his testimony in connection with all the other evidence, and also in taking into consideration the fact that the expert did not see the property and was not acquainted with it in 1912, and was warranted in placing the value at $250,000 exclusive of good will. Other witnesses valued this property much lower. One of them shows from his testimony that he was a prejudiced witness against the Munday concerns, and the others, with possibly one exception, clearly showed by their testimony that they were not sufficiently posted to give correct conclusions as to valuations.

The evidence in the record discloses that Munday & Co. had been running a flour mill in connection with warehouses and the various elevators and were engaged in buying and selling grain and in producing and selling flour. They did a large domestic and export business and also had a good local trade. During the seasons of 1911 and 1912 their business was unusually large. They purchased from one broker in Chicago more than $658,000 worth of grain. Seagrave's testimony was that their profits were from $30,-000 to $50,000 a year. Another witness testified that their profit on domestic business was from $50,000 to $60,000 a year but that in 1912 they suffered a loss of from $43,000 to $100,000 on their export trade. Some idea may be had of the magnitude of their business by their deposits in the National Bank, which were more than $2,900,000 covering

a period of two years and five months, and in the Litchfield bank approximately $3,000,000. We have recited these facts as our reason for approving the Appellate Court's finding that the good will of the concern was worth at least $25,000. Nothing was allowed in this accounting by the Appellate Court for grain in transit. The firm was justly entitled to a credit of at least $32,496.42 on the asset side of this account, but as that court has considered transit items under its Division 15, we have reserved the consideration of this item for our discussion of transit items, in connection with which Munday's liabilities and assets are considered, and for the further reason that Munday & Co., the Litchfield Mill and Elevator Company and all other Munday concerns are considered as Munday individually.

The master finds that of the John K. Seagrave and J. K. Seagrave & Co. indebtedness $10,013.13 was paid or canceled September 23, 1913, by charging that amount to the deposit account of C. B. Munday & Co. in the trust and savings bank, which was on that date $15,314.46; that $22,500 thereof was credited out by a charge to cash on October 6, 1913, which was taken up with a check or draft on October 7, 1913, and that the remainder of the debt was exchanged December 30, 1913, for two notes of the Litchfield Mill and Elevator Company, which, together with three other notes of that company, were exchanged for a certificate of deposit for $25,000 of the East Alton Bank, which was afterwards paid. Both the master and the Appellate Court twice charged this entire indebtedness to C. B. Munday. All members of the Appellate Court found that this debt was worthless, either as a debt of John K. Seagrave, of J. K. Seagrave & Co. or of C. B. Munday.

### Division 2.

The bills receivable of this division consist of the paper of the following banks in the following amounts: Citizen's State Bank of Alhambra, $6986.58; Farmer's Bank of

Bethalto, $11,242.93; Bank of Marine, $10,202.26; First National Bank of Mt. Olive, $15,052.50; and State Bank of Oconee, $10,050.88. The aggregate amount of these debts is $53,535.15, and we have allowed them all in full as good and collectible assets. The evidence amply supports the master in his finding, who also allowed them in full. All members of the Appellate Court agreed that the debts of the Bank of Alhambra and the First National Bank of Mt. Olive were paid in full according to the record evidence and allowed both of these debts. Two members of the Appellate Court allowed in full the debt of the Bank of Oconee for the same reason,—that it was paid in full according to the testimony of Kadish. The other member of the Appellate Court dissented and held that this claim was worthless. Two members of the Appellate Court only allowed $9805.68 for the debt of the Farmer's Bank of Bethalto, which amount they found was actually paid according to the evidence, and the remainder of the debt they found to be worthless, while the third member of the Appellate Court found the entire debt to be worthless. The direct liability of the Bank of Marine was on a certificate of deposit for $10,000, dated June 2, 1912, and payable January 2, 1913, the unearned interest thereon being $95.83. The indirect liability was for $298.09 on a note of F. H. Rohmeyer and others discounted by the Bank of Marine to the National Bank, and which note was paid in the usual and ordinary course of business, according to the evidence. All members of the Appellate Court agree in allowing the indirect liability in full because it was paid, but hold that the direct liability is worthless.

The record evidence shows that the five banks were very prosperous down-State banks in October, 1912, and had been for years prior to that date, and continued as going banks during the existence of the trust and savings bank. The master and the Appellate Court both found, when considering Munday's assets, that on October 21, 1912, the

market value of the stock of the Bank of Marine was $150 per share, the stock of the Farmer's Bank of Bethalto $120 per share, the stock of the Citizen's Bank of Alhambra $150 per share, and the stock of the State Bank of Oconee $125 per share. Munday had stock in all of the banks except the First National Bank of Mt. Olive, and this was one of the principal grounds of the receiver's contention that none of the debts of the five banks were good. We do not deem it necessary to at this time further discuss the liabilities of the three of these banks whose debts were given full value by the Appellate Court. We will have occasion to consider the receiver's other ground of objection when we come to consider Munday's indebtedness to the National Bank.

The indebtedness of the Farmer's Bank of Bethalto was a certificate of deposit dated September 25, 1912, due on demand. It never was collected in full. After the receiver was appointed he applied the final deposit balance of this bank in the trust and savings bank on this debt to the amount of $9305.68. Afterwards the bank paid the receiver $500 in part payment of the balance. The uncontradicted evidence in this record is that on October 21, 1912, the Bank of Bethalto had on deposit in the National Bank $6798.55. On October 11, 1912, its deposit account was $14,947.67; on January 23, 1913, $28,823.56; in February of the same year $32,685.69; and in March of the same year its deposit account reached as high as $32,479.26. It is thus shown conclusively that if demand had been made on this note or certificate of deposit it could have been easily collected on any one of the above dates except October 21, 1912, by charging it to the deposit balance of the Bank of Bethalto. There is no reasonable theory from the evidence in this record upon which to base a conclusion that this debt was not a good and collectible debt on October 21, 1912, so far as we are able to see. It is simply another case in which the trust and savings bank made no effort to urge or press the debt for collection. Had such effort been made, this bank,

312—28

whose stock was selling at $120 per share at that time, would undoubtedly have paid off the certificate. It could not have afforded to do otherwise. It was only the closing of the trust and savings bank that ever at any time rendered this debt uncollectible, if it is really uncollectible at this time.

The certificate of deposit of the Bank of Marine was eliminated from the National Bank on November 21, 1912, by the substitution of three notes of H. W. Huttig and the Huttig Manufacturing Company, and the canceled certificate of deposit was returned by the trust and savings bank to the Bank of Marine. The claim for disallowing the debt of the Bank of Marine is that the Huttig notes were never paid.. The real question on this record is whether or not the certificate of deposit on the Bank of Marine was good and collectible on October 21, 1912, and if it was, this is the end of the inquiry so far as the Central Trust Company is concerned. There is no contention that the Bank of Marine was insolvent and its paper worthless on that date. The actual showing is that its deposit account in the National Bank in January, 1913, was not less than $19,532, and that the high point of that account was $45,581.65, and that the certificate of deposit was due in that month. Its deposit account after January, 1913, and up to April, 1914, was not less than $17,700, and there was no month within that time that its deposits did not reach as high as $36,362, and within that time the high point was $170,889.63. This evidence settles it beyond question that this debt was first class and could have been collected at any time after due up to May, 1914.

### Division 3.

There are seventeen debts or claims in this division, numbered by the Appellate Court from 1 to 17, inclusive. We find the aggregate value of all these bills receivable to be $294,231.84. The master and two members of the Appellate Court have allowed in full under this division the following claims in the following amounts: Granville W.

Browning, $5454.35; William Carey, $2482.10; Collie Clavin, $10,033.05; William DeBuhr, $7696.23; Frank J. Delaney, $8688.79; John R. Farthing, $14,570.72; Annie V. McComb, $1968; William J. Moxley, $54,912.49; and Walsh Bros. Western Securities Company, $49,144.83. The other member of the Appellate Court agreed with the master and the other members of the court as to only four of the above mentioned claims, to-wit, those of Browning, Delaney, Moxley and Walsh Bros. Western Securities Company. The principal question passed on by the master and the Appellate Court is whether or not payment was made in full on the same as disclosed by the record. As to one or more of these claims there was a further question whether or not the claims were good and collectible on October 21, 1912. The evidence sustains their finding in every instance as to the claims allowed, and we do not deem any further comment necessary.

Item No. 1 under this division was a note of $3010.50, including accrued interest, of the Bethalto Lumber Company, dated August 13, 1912, due on demand. The evidence is to the effect that it was a partnership, consisting of C. B. Munday, or C. B. and J. G. Munday, and E. R. Starkey. Starkey owned a half interest. The proceeds of this loan appear to have been credited to the account of the Litchfield Mill and Elevator Company. The trust and savings bank sold and transferred this note to the Farmer's Bank of Bethalto, and it was not in the trust and savings bank afterwards. The testimony of H. H. Starkey, brother of E. R. Starkey, deceased, is to the effect that this was the only note or obligation of the lumber company, and that the company had sufficient stock or lumber in the yard at all times to pay this debt, and his testimony is uncontradicted. This note was collectible at least a year or more after it was given, as the lumber company was a going concern until after the trust and savings bank closed. J. G. and C. B. Munday were liable to the National Bank for

any part of it not paid by the lumber company, under the law of partnerships. We have therefore allowed this claim in full, charged the same to C. B. Munday in his account and also given him credit for an equal amount of assets, as the partnership is shown to have been solvent on October 21, 1912.

David Davis was indebted to the National Bank on his notes amounting to $30,217.83 and as an indorser in the further sum of $10,110. The master found that he was solvent October 21, 1912, and well able to have paid this indebtedness, and that in the opinion of prudent and conservative bankers acquainted with his financial condition he was worth from $20,000 to $25,000 over and above his debts. One member of the Appellate Court approved this finding. Another member of the court allowed the sum of $10,035 on the direct liability, which the record positively shows, without contradiction, was paid by Davis. The third member of the court allowed nothing. The master's finding is sustained by the evidence. The receiver offered no testimony. A banker living in Litchfield, well acquainted with Davis and who knew all about the properties that he owned, testified positively that on said date Davis was worth $15,000 or more over and above his indebtedness, and his testimony is uncontradicted. The receiver offered no rebutting evidence. The evidence satisfies us that all of Davis' indebtedness to the bank could and would have been collected if the bank had made proper effort to do so. We know of no rule of law by which we are permitted to disregard the *prima facie* case made by appellee.

Claim No. 9 in this division was a note of John M. Lavin for $2000 which he had executed to the bank to settle his liability as an indorser of certain notes of the Federal Fuel Company. This note came into the hands of the receiver and there was paid thereon to him $280. The receiver compromised the indebtedness to the bank for $1000 in addition to the amount already paid. The master applied

the $280 credit on Lavin's note and only allowed that sum
as the value of his note.   He applied the other $1000 pay-
ment to two other notes of Lavin for $2500 each, which
were given in payment for stock of the National Bank.
Two members of the Appellate Court applied this latter
payment, and also the payment of $280, on Lavin's $2000
note and allowed $1280 as the value of the note.   We ap-
prove the Appellate Court's action in applying both credits
on the $2000 note, and we value the note at $1140,—the
amount of the debt completely discharged by the payments.
The Appellate Court failed to recognize the fact that simple
payment on a note does not reduce the total indebtedness to
the amount of the payment unless the interest on the note
is paid up to the date of the payment, in accordance with
the rule that we have already announced as to partial pay-
ments. · The two notes of Lavin for $2500 each were sold
to the trust and savings bank on March 10, 1913, by the
Bank of Bethalto and remained in that bank until it closed,
according to the testimony of Kadish, and were not a liabil-
ity of Lavin to the Bank of Bethalto at any time thereafter.
According to the testimony of Kadish, and other evidence
in the record, these notes of Lavin for $5000 were liabili-
ties of Munday, and should be included among his liabilities
because the notes were given for bank stock which Mun-
day got and did not credit to Lavin's account.   We have
therefore charged them as liabilities against Munday, as will
later appear.

As to item No. 11 in this division, the master and two
members of the Appellate Court found that Sims Maguire's
demand note No. 8029, for $25,000, and his indirect lia-
bility of $332.32, amounting to $25,419.82, to the National
Bank was completely discharged by payments.   The other
demand note for $18,540, dated October 14, 1912, was not
paid in full, but there was a total reduction of this debt of
$615.50 by payments to the bank before it came into the
hands of the receiver.   The receiver has collected nothing

on the notes.   Maguire had a deposit balance on October 21, 1912, in the National Bank of $1010.75, which could have been applied by the bank on this demand note, and the master finds that the indebtedness on this note should be further reduced by that sum, making a total reduction thereof of $1626.25.   We sustain the finding of the master and find the value of this item to be $27,046.07, the amount of the first note plus the total amount paid on the second note, because the evidence clearly sustains him.   The Appellate Court allowed nothing for the second note and the dissenting member of the Appellate Court found both notes to be worthless.

Item No. 13 of this division was a demand note of the Pleasant Valley Land Company for $10,035, dated July 22, 1912.   On January 13, 1913, this note was paid by charging it against the credit balance of C. B. Munday & Co., and the note was eliminated from the bank.   The proceeds of the note when given were credited to the Litchfield Mill and Elevator Company.   There was no evidence as to the financial condition of the Pleasant Valley Land Company on October 21, 1912.   The payment of the note by C. B. Munday & Co. was a recognition of the fact that they were liable for this note to the bank, either directly or indirectly. The result would not have been different had C. B. Munday & Co. borrowed the money themselves July 22, 1912, on their own note and paid it January 13, 1913, by having it charged to their deposit account.   It made no difference where the money came from so the bank actually received payment.   It was their liability and they were solvent on that date, and the argument by the receiver that Munday & Co. were insolvent on October 21, 1912, cannot be sustained by the record.   We have allowed this debt in full and have also charged it as a liability to C. B. Munday.   The Appellate Court found the note to be worthless.

Item No. 14 consisted of two notes aggregating $1051.43 including accrued interest, given by Lloyd J. Smith.   The

small note, of $300, was a demand note and was collected in full after it came into the hands of the receiver. The other note was due on October 18, 1912. The undisputed evidence in the record is that Smith's entire indebtedness could have been collected from his deposit account, notably in November, 1912, when his deposit account ran as high as $2481.33. In May, June and July, 1913, his deposit account exceeded the total amount that he owed. His indebtedness at no time exceeded $1550.50 up to August 30, 1913. Thereafter his indebtedness rose to $6400, and because this entire indebtedness was not collected and there was due a remainder of $1115.44 at the time the master took the evidence, the receiver contends, and the Appellate Court finds, that nothing should be allowed on this debt. We sustain the master in allowing this debt in full.

Item No. 15 is represented by five notes, aggregating $25,764.46, of Clinton S. Woolfolk, and two demand notes of the Texas Gulf Realty Company, aggregating $50,175. Woolfolk's note for $10,035, including accrued interest, was reduced to another note of $4500 May 3, 1913. This reduction was made by Woolfolk giving the bank a note and mortgage of Hudson D. North for $5500 of the debt. The note and mortgage were unquestionably good and collectible. The $4500 note was taken up by a note of the Illinois-Louisiana Land Company on October 11, 1913. Note No. 8123, for $2496.67, was secured by collateral and was charged to his account on the day it was due. No. 8124, for $2485, less unearned interest, was collateraled, and the books of the bank show that it was paid on its due date, November 25, 1912. No. 8125, due December 27, 1912, for $2471.67, less unearned interest, was secured by collateral and shown to be paid on its due date. The last note was a demand note for $8276.12 and was also secured by collateral. It was reduced on November 11, 1912, by credits to the sum of $6166.66. The remainder of this note is shown to have been paid in full. Most of the payments on

the above notes may have been made, as contended by the receiver, out of the proceeds of $75,000 worth of notes of the Illinois-Louisiana Land Company and the proceeds of a $50,000 loan to the Texas Gulf Realty Company, but the record does show that Woolfolk was the owner at those times of $33,057.50 of certificates of deposit of the National Bank and that the bank might have charged his indebtedness against these certificates, or at least have made the money out of Woolfolk by pressing the claims for collection. He was undoubtedly well able to pay the debts to the bank at the time they were due and had the confidence of the banks and business men generally and appears to have had almost unlimited credit. The Texas Gulf Realty Company maintained a deposit account on October 21, 1912, and up to November 25, 1912, which was not less than $2115.89 between those dates. It was over $4000 on four different days between those dates, and there were six other days between those dates when it was over $3000. It was $3363.87 on October 22, 1912, and the bank could have collected this last amount by applying the amount of the deposit on the demand notes. We agree with the finding of the Appellate Court that nothing further could have been realized, with anything like certainty, on these notes and that their value should only be $3363.87. The master allowed full value for the same, and the Appellate Court only allowed full value for one of the small notes of Woolfolk, which was found to have been collected. Our total valuation for these two claims is $29,128.33.

Item No. 16 is represented by six $5000 notes of the Topeka Milling Company, aggregating $29,742.12, less unearned interest. All were dated August 14, 1912. Two were due November 12, 1912, three December 16, 1912, and one February 14, 1913. The milling company received for these notes three certificates of deposit of the Bank of East Alton and three of the Bank of Smithboro, for $5000 each. The six notes held by the bank were executed to

Munday and he discounted the notes to the National Bank, and the proceeds of five of them were credited to the First National Bank of Litchfield and one of them to the Litchfield Mill and Elevator Company. All six of these certificates of deposit were charged to the liability account of C. B. Munday. On January 28, 1913, the milling company returned to Munday two of the certificates of deposit and directed him to return to it two of its notes, which was done and the obligation of the milling company was extinguished on these two notes. Munday at the same time paid off these two notes in the trust and savings bank by his check drawn on the Bank of East Alton, which was paid in due course of business. The foregoing facts are undisputed, and it must be held that there was a complete discharge of the milling company's liability as to two of the notes, the bank having received full payment thereof. The other four notes were twice renewed and were in the bank on July 24, 1913, when the milling company went into the hands of a receiver. Thereafter the trust and savings bank and its receiver collected an aggregate of $18,502.50 on the notes, leaving a balance due of $1497.50. In making this collection the receiver paid an attorney fee of $1500. The net result to the creditors was $17,002.50. Much of the testimony in the record tends to show that the milling company was solvent October 21, 1912, and that its assets amounted to about $60,000 over its liabilities. It had $109,-393.40 of liabilities on October 21, 1912. None of the notes to the National Bank were then due and the last note was not due until February 14, 1913. The evidence is also to the effect that at the time the milling company borrowed the money from Munday in August, 1912, it had exhausted its credit in the banks of its home State, Kansas, and was not making any money at that time, for which reason the Kansas banks had refused to loan it money and were demanding payment of the amounts due them. This state of affairs continued until it went into the hands of a receiver.

It is apparent that in order for all creditors to have collected their money in October, 1912, or at any time thereafter, legal proceedings would necessarily result, and did result by throwing it into the hands of a receiver. Only ninety per cent of its indebtedness was paid by the receiver after its affairs were wound up. This showing is not inconsistent with the fact that it might have been able to pay all its debts if it could then have made a sale of its assets at a reasonable price, and it is not an unusual circumstance that at forced sale made by the receiver it fell short by ten per cent of paying its indebtedness. We do not think that we are warranted, under the evidence, in allowing more than has been actually collected on this claim less actual attorney fees paid in collecting the same, and in addition thereto whatever the evidence shows with reasonable certainty the receiver will collect on the balance due less attorney fees. On this latter question the evidence is to the effect that all four of the notes that were unpaid were guaranteed by the written guaranty of Herbert and George W. Hackney, president and vice-president of the company and residents of Kansas. The undisputed evidence is that they were worth $25,000 over and above liabilities. Suit has been brought against them by the receiver, and it appears reasonably certain from the testimony of the receiver's attorney, Edwin A. Austin, that a judgment will be obtained against the guarantors and the same collected. From the nature of the litigation it is probable that about one-half of the remaining amount, or near that sum, will be expended in collecting the remainder unpaid. We have no means of knowing what the attorney fee will be, but a fee of $700 ought to be amply sufficient to pay the same. Therefore we allow the entire claim of this debtor, $29,742.12, less attorney fees already paid and to be paid of $2200, or $27,-542.12. The master allowed the full amount of this debt. Two members of the Appellate Court allowed $18,502.50,— the amount actually collected by the receiver, less the $1500

attorney fee for collecting the same,—and allowed nothing on the remainder. The third member of the Appellate Court found the claim to be worthless.

#### Division 4.

There are eleven bills receivable in this division, designated by the receiver as "Lorimer paper." The following are the names of the debtors, which are followed by the amounts they owed the National Bank on October 21, 1912, to-wit: John A. Cooke, $10,238.33; Federal Improvement Company, direct liability $6117.15, indirect liability $357.83; George J. Fitzpatrick, $790.67; Joseph P. Gallagher, $49,171.50; W. T. Keating, $2508.75; William Lorimer, $15,012.51; Lorimer & Gallagher Company, $104,865.75; Albert G. Schillo, $300.85; E. W. Schillo, president, and Schillo Bros., $6522.75; Adam Schillo, $3846.90, and Helen Schillo, $5017.50. We have allowed on all of the foregoing claims the aggregate amount of $189,737.98.

The first note under this division is that of John A. Cooke for $10,238.33, including accrued interest. This debt is the debt of William Lorimer and is listed as a liability of Lorimer by both the master and the Appellate Court. At the time Cooke gave this note Lorimer gave him ample collateral security to secure it. Later Cooke returned the collateral to Lorimer in consideration of Lorimer's agreement to pay the note to the bank. The bank recognized it as Lorimer's debt by receiving from him interest on the note. It is the law of this country and of this State that a third party may maintain an action on a promise made to another for his benefit. (*Bristow* v. *Lane,* 21 Ill. 194; *Eddy* v. *Roberts,* 17 id. 505; *Thompson* v. *Dearborn,* 107 id. 87.) There is no dispute about the foregoing facts as testified to by both Lorimer and Cooke. We allow full value for this claim, for the reason that Lorimer was solvent on October 21, 1912, as will later appear.

The following claims under this division were allowed in full by the master and two members of the Appellate Court on the ground that they were paid in full or that the debts were good and collectible on October 21, 1912, to-wit: Those of the Federal Improvement Company, Joseph P. Gallagher, W. T. Keating, the Lorimer & Gallagher Company, E. W. Schillo, president, and Schillo Bros., Adam Schillo and Helen Schillo. The third member of the Appellate Court agreed with the other members of that court and the master as to the claims of Joseph P. Gallagher, the Lorimer & Gallagher Company, and E. W. Schillo, president, and Schillo Bros., and also agreed with them as to the indirect liability of the Federal Improvement Company. The remainder of these claims he found to be worthless. We have allowed full value for all of them.

As to the claims of George J. Fitzpatrick and Albert G. Schillo, and the overdrafts of William Lorimer, Jr., and Josephine H. Lorimer, which overdrafts have heretofore been allowed in full by us, we consider them together at this time for reasons now given. The overdraft of Josephine H. Lorimer of $46.12 on October 21, 1912, was increased to $178.55 on November 15, 1912, and continued in this amount until November 30, 1912. On the last named date the overdraft in the latter sum and the overdraft of William Lorimer, Jr., which had increased from $267.12 to $288.12, were both eliminated by a check of William Lorimer, Jr. On the day this check was drawn, November 30, 1912, William Lorimer, Jr., gave a note for $3000, and the overdrafts were paid out of the proceeds of that note. The $3000 note was paid December 28, 1912, by William Lorimer, Jr., by discounting a note of William Lorimer, Jr., trustee, which was secured by a mortgage on the Pistakee Bay property, which had been previously deeded to him by his father, William Lorimer. The note and mortgage were for $20,000. The note and mortgage were subsequently paid in full. The foregoing facts are

testified to by Spohr and are uncontradicted. Spohr, who is an expert accountant employed by the receiver and who had been general auditor of the National Bank and of the trust and savings bank during their entire existence, further testified that about July 24, 1913, the $790.67 note of Fitzpatrick and the note of Albert G. Schillo for $300.85 treated under this division were charged against the deposit account of William Lorimer, Jr., and that at the beginning of business on that day his deposit account was $33,049.11 and at the close of business on that day $21,777.89. These credit balances were obtained by Lorimer, Jr., on July 23, 1913, by two credits, one of $24,250 and another of $24,338.54, which were obtained by the sale of two notes and mortgages, for which he received cash, and the proceeds were passed to his credit on the books of the bank. The foregoing testimony settles beyond question that the overdrafts and the Fitzpatrick and Schillo notes were paid with real cash deposited in the bank. The testimony of Spohr is also corroborated by Kadish, and on this testimony we have allowed the overdrafts and the two notes in full, as did also the master. The Appellate Court allowed nothing on the overdrafts and found the two notes to be worthless.

As to Lorimer's paper in this division a great deal has been said by the receiver, but it will only be necessary to confine our consideration of the same to the facts in the record. The plain, simple facts shown by the record are to the effect that on September 16, 1912, Lorimer informed C. B. Munday that he desired to borrow $30,000, and Munday informd him that he could get it for him at one of his down-State banks. Thereupon Lorimer executed to him his notes for $30,000, secured by a mortgage on his Michigan farm of 670 acres, and upon delivering these instruments to Munday the latter gave him six certificates of deposit of the Bank of Smithboro, which Lorimer indorsed and discounted to the National Bank. Three of these certificates of deposit were dated September 16, 1912,

and were due September 12, 1913, and they bore the National Bank's numbers 8345, 8346 and 8347, and have heretofore been considered by us in our consideration of the indebtedness of the Bank of Smithboro. The other three were dated October 15, 1912, and were due September 12, 1914, and bore the National Bank's numbers 8698, 8699 and 8700 and constitute the indebtedness charged to Lorimer in this division. It thus appears that all these certificates of deposit were the direct liability of Munday and that Lorimer was only liable to the National Bank as indorser. ·

About the strangest feature that we are able to note about this whole transaction is, that only three of the certificates were charged to the Bank of Smithboro, the direct debtor, while the other three were charged to Lorimer, the indirect debtor, upon the books of the National Bank and were not charged to the Bank of Smithboro at all. We have regarded them all as the direct liability of the Bank of Smithboro and have allowed them all as good assets against that bank under Division 1, and we will therefore allow nothing as against Lorimer for the three certificates here considered for the reason already stated, and for the further reason that the record shows that Lorimer in April, 1914, sold his Michigan farm for $42,500 in cash and with the money paid off his notes and mortgage given to Munday and received his notes and mortgage from the trust and savings bank, which had custody of them and was at that time the owner of them. So far as Lorimer was concerned, this canceled all his direct liability to either the National Bank or to the trust and savings bank concerning this loan. On October 23, 1912, Munday discounted the notes of Lorimer to the trust and savings bank after the National Bank had been denationalized and the proceeds were credited to his account, and this is the full explanation of how the trust and savings bank came into possession of these notes and mortgage. It appears from the evidence that Lorimer did not know anything about this

latter transaction of Munday until quite a while thereafter. The notes and mortgage of Lorimer were good security for his debt and no one questions that fact.   They were the property of Munday on October 23, 1912, and the trust and savings bank being a State bank, was permitted, under the law, to buy the same, and there was absolutely no prohibition against Munday selling the same, and the end-less argument to the effect that the two banks "thus lost" $60,000 upon the worthless paper aforesaid cannot be made effective under the facts in this record.   The fact is, Lorimer discharged all of his direct obligation in this transaction and Munday owed his direct obligation on the certificates of deposit to the trust and savings bank or its assignees, and they are all properly charged to him in his liability account.   The master found three of these certificates of deposit good and collectible assets on the ground that Munday was solvent and liable on the same, and this was one of his reasons for allowing these claims against the Bank of Smithboro.   He has allowed the claims on the other three their full face value against Lorimer under this division on the ground that he was solvent and liable for the same.   The Appellate Court allowed three of them against the Bank of Smithboro and allowed the other three against Lorimer under this division on the theory that the certificates of deposit were good and collectible because secured by Lorimer's notes and mortgage, and has refused to allow any of them on the ground of the solvency of either Munday or Lorimer and found both of them to be insolvent.   As a matter of fact, the certificates of deposit never were secured by the mortgage of Lorimer.   It was the notes of Lorimer that were secured by the mortgage,— in the first instance a debt to Munday.   The certificates of deposit must be held good upon the solvency of Munday or of Lorimer, as the National Bank and its assignees had to depend entirely upon the obligation of Munday as maker and Lorimer as an endorser.

It will be necessary to consider the question of Lorimer's solvency only because of the fact that he was liable to the National Bank on two other notes which we have allowed in full, to-wit, the note of John A. Cooke, considered under this division, and the note of William Webb, to be considered under a subsequent division. The Central Trust Company admitted that the liabilities of Lorimer on October 21, 1912, are as charged to him by the Appellate Court, and are the following:

| | |
|---|---:|
| To National Bank on Smithboro certificates | $30,000.00 |
| To National Bank on John A. Cooke note | 10,238.33 |
| To National Bank on William Webb note | 1,987.67 |
| To Munday on notes | 22,000.00 |
| To Munday on open account | 65,646.32 |
| To Moxley on note | 90,000.00 |
| To Moxley other than on note | 15,000.00 |
| To Ernest Magerstadt | 12,000.00 |
| To Lorimer & Gallagher Company | 4,429.27 |
| Other indebtedness, general | 18,000.00 |
| Total | $269,301.59 |

It will be noted that Lorimer's indirect liability on the certificates of deposit is charged to him in this list of liabilities, and that the notes and mortgage to Munday, which were a direct liability of his on October 21, 1912, are not charged as a liability. The Appellate Court found Lorimer's resources or assets, and their values, on October 21, 1912, to be the following:

| | |
|---|---:|
| Michigan farm (equity) | $12,500.00 |
| Bittersweet property (equity) | 10,000.00 |
| Ridgeway avenue property | 17,000.00 |
| Pistakee Bay property | 40,000.00 |
| Cash in bank | 5,008.97 |
| Half interest in Lorimer & Gallagher Company | 47,892.48 |
| 900 shares of stock in National Bank | 94,500.00 |
| Total | $226,901.45 |

It will be noted that in the above list of assets the Appellate Court gave Lorimer no credit for the $30,000 certificates of deposit or Munday's liability thereon, which we have found to be of full value. We do not controvert the

proposition that for a proper casting of Lorimer's assets and liabilities his indirect liability on the certificates of deposit is properly charged to him as a liability, but if that is done he should have credit for his right against Munday to make the certificates of deposit good. Our accounting as to this item of liabilities and the corresponding assets would simply offset each other, but our accounting as to the notes and mortgage and the corresponding assets makes $30,000 difference in favor of Lorimer. In other words, we would charge to Lorimer as a liability $30,000 for the notes and mortgage given to Munday on his Michigan farm, and we would give him as an asset against that liability not simply an equity in the farm less Munday's mortgage, but the value of the farm itself. By the Appellate Court's method of accounting Lorimer has suffered a $30,000 loss by a simple error in book-keeping or in casting the accounts, because the Appellate Court found as a matter of fact that Lorimer's farm in October, 1912, was worth just the amount Lorimer obtained in cash for it in April, 1914, ($42,500,) as it only gave him an allowance on the farm of $42,500, less the notes and mortgage, or $12,500. In other words, it only gave him credit for the equity instead of the value of the farm. We are in doubt as to whether or not the Appellate Court has made a similar error in accounting as to the Bittersweet property. The facts are, that Lorimer paid for this property $10,000 in cash and assumed a mortgage thereon of $12,500, making the cost price to him $22,500, the latter sum being the value the Appellate Court actually found the property to be worth October 21, 1912. The evidence does not show whether or not the note and mortgage are charged to Lorimer in his liabilities.

On the valuations of Lorimer's assets we are forced to disagree with the Appellate Court as to three of those items. Lorimer was forced to sell his Michigan farm in 1914 at a time, as all the evidence in the record shows, when property in this country was selling much lower than in 1912. The

record shows that about the highest time for real estate in this country for several years prior to and after 1912 was in October, 1912, the time at which this property is to be valued. Lorimer testified that this property was worth $75,000 on October 21, 1912. There were two other witnesses, who were farmers in the neighborhood of the land, who valued it considerably higher than Lorimer, but the basis of their valuations was erroneous and improper. The master valued the farm at $68,300. We feel sure that this land ought to be valued at least at $50,000.

The testimony shows that Lorimer bought the Bittersweet property in 1912, while it was in litigation, and at a very low figure. This property was sold in the summer of 1914 for about $30,000 at a time when real estate values were lower than in 1912. A competent witness as to the value of this land testified it was worth $53,750 in October, 1912. One witness by the name of Mullaley testified that he bought part of this land from Lorimer in August, 1914, for $12,000, and that he sold the same part in October, 1916, for $30,000, without additional improvements. The master found the value of the property as of October 21, 1912, to be $38,125, and we sustain his finding, as the evidence in the record amply sustains his valuation, and even a higher one. We have only given a value to the equity in this property in our accounting and have deducted from the full value the $12,500 mortgage, and value the equity at $25,625 under the assumption that the mortgage was not charged by the Appellate Court.

The testimony in the record bearing on the value of the Ridgeway avenue property shows that property was at least of the value of $25,000 on October 21, 1912. Two expert real estate men in Chicago, Levy and Pace, valued this property, respectively, at $46,500 and $40,000. Lorimer valued the property at $35,000. This was Lorimer's home. Lorimer sold this property in 1913 for $17,000, at a time when real estate was lower in Chicago than in 1912.

Both the master and the Appellate Court valued it at $17,-000, the price for which it was sold in 1913, and refused to consider the evidence as to what it was worth on October 21, 1912. The value of the real estate on that date is what we are to ascertain in this case, and we are not content to value it at less than $25,000, and would value it at $35,000 if a higher valuation made any material difference in this case, because we must be controlled by the evidence. The receiver had the option to introduce further testimony if he saw fit to do so, and his failure in that particular warrants us in the conclusion that his effort to lower the value fixed by the witnesses would have been unavailing. For the reasons aforesaid we find the assets of Lorimer and their values on October 21, 1912, to be the following:

| | |
|---|---:|
| Michigan farm | $50,000.00 |
| Bittersweet property (equity) | 25,625.00 |
| Ridgeway avenue property | 25,000.00 |
| Pistakee Bay property | 40,000.00 |
| Cash in bank | 5,008.97 |
| Interest Lorimer & Gallagher Company | 47,892.48 |
| National Bank stock | 94,500.00 |
| Munday's obligation on certificates of deposit | 30,000.00 |
| Total | $318,026.45 |

We add to Lorimer's liabilities as found by the Appellate Court $30,235 for his notes and mortgage on the Michigan farm to Munday and find his total liabilities to be $299,536.59. As we have found Lorimer to be solvent we have allowed the John A. Cooke note in full, and will also allow the William Webb note in full for $1987.67 when we come to consider it in a subsequent division. The evidence clearly shows that Lorimer was liable on the Webb debt, and he states in his testimony that he was so liable. The receiver applied a credit balance of $194.62 on Cooke's note when it came into his hands, and he also realized a substantial credit by compromise with Cooke, the total sum thus collected being $4044.25. The master allowed this latter sum on Cooke's indebtedness and found the remainder

worthless, and two members of the Appellate Court did likewise. The third member of the court allowed nothing. On the Webb note the master allowed $22.82, being the amount of his deposit account when the note came into the receiver's hands, and found the remainder of the note worthless. The Appellate Court found the entire note worthless.

### Division 5.

The bills receivable under this division are owed by the following named debtors in the following amounts: H. W. Huttig $39,136.60; Huttig Manufacturing Company, direct liability $2560.80, indirect liability $7096.58; and John R. Norris $1000.51. We have allowed full value for all these items, amounting to $49,794.49. The master also allowed full value on all three of these items. Two members of the Appellate Court allowed on the Huttig claim $35,000, allowed the debts of the Huttig Manufacturing Company in full, and on the Norris claim only $500. The third member of the court found all three of the claims to be worthless.

The note of H. W. Huttig was secured with notes of F. J. Moss of the face value of $39,600, 350 shares of the American Sash and Door common stock, and Huttig's trust receipt for 320 shares of stock in the Omaha State Bank. On October 25, 1912, Huttig put up 40 more shares of said bank stock as collateral. On December 21, 1912, John R. Norris, an insurance salesman, borrowed $50,000 from the trust and savings bank and took up Huttig's $39,000 note. He did this for Huttig and gave as collateral to the latter note 360 shares of the bank stock of the Omaha State Bank and 26 bonds of the Motzorongo Company, par $500 each, and also a note of the Cemetery Securities Company for $47,000, all of which was obtained by him from Huttig. In May, 1914, the trust and savings bank gave all of the above collateral and the Norris note, together with other paper, to the city treasurer of Chicago, Flynn, as se-

curity for the deposits of the city. The Omaha State Bank
was organized in September, 1912, with a capital stock of
$300,000 and $75,000 surplus, and the shares of stock were
paid for at $125 per share. The undisputed testimony of
Robert S. Drusdow is that he sold stock of said bank in
November, 1912, at $130 per share. This bank stock was
therefore worth on October 21, 1912, the amount paid for
it, $125 per share, and Huttig's 360 shares must have been
worth $45,000 on the date Norris put them up as security
for the $50,000 loan. Receiver Niblack, for the trust and
savings bank, on application to the Cook county circuit
court, secured an order authorizing him to sell to Huttig
for $35,000 cash the $50,000 note of Norris, together with
all the above collateral which secured the same. Joseph O.
Morris, a Chicago attorney, gave the uncontradicted testi-
mony that he told Huttig he could get Niblack to sell the
Norris note and the collateral thereto for less than its face.
Huttig thereupon gave Morris $40,000 cash and told him
he could have the difference between that sum and the
amount he could get Niblack to accept for said note and
collateral. Morris talked with Niblack and got him to take
$35,000 cash for the note and collateral, and in pursuance
of this agreement Niblack secured the order of court. The
witness Drusdow further testified before the master that
the lowest price he had ever sold bank stock of the Omaha
State Bank was $117.50 per share, and that sale occurred
in February, 1915, about the time the court order was en-
tered; that in 1914 he sold this bank stock for $122.50
per share, and within the last year (the year in which he
testified) as high as $132.50 per share. Huttig's bank stock
of 360 shares was worth at least $42,300 at the very time
Niblack made the above agreement. Bonds of the Mot-
zorongo Company were worth par according to the uncon-
tradicted testimony of the manager of that company, Al-
fred M. Turner, and the company had assets on July 15,
1912, of $2,009,567.10, on which there was a first lien to

secure $167,300 of bonds. Those held by the receiver as collateral were part of those bonds, and in 1915, when the collateral was sold back to Huttig, the profits of the company were $65,561.50. Under this evidence the 26 bonds held by the receiver were of the value of $13,000. The undisputed evidence also shows that Huttig, in order to raise the $40,000 that he paid Morris to compromise with the receiver at $35,000, borrowed $40,000 from the Omaha State Bank upon 360 shares of stock of that bank as collateral, being the same number of shares held to secure the $50,000 note. It is upon the above evidence that we allow full value for this note.

The master and two members of the Appellate Court found from the evidence that the liability of the Huttig Manufacturing Company was paid, and the record evidence sustains that finding. The vice-president of the First National Bank and the First Trust and Savings Bank of Muscatine, Iowa, testified that on October 21, 1912, the Huttig Manufacturing Company owed his bank $52,000, unsecured, and that the indebtedness was all subsequently paid. He regarded the paper as perfectly good in October, 1912. He was familiar with the company, its plant and its business and kept in close touch with its affairs. It carried a large stock of merchandise of about $150,000, and its volume of business ran from $50,000 to $70,000 per month. The company paid dividends for a number of years and was still a going concern in 1918, when this evidence was taken, and was in all respects prosperous and earned for the year 1917 about $50,000 net profits. There is absolutely no testimony that the company was not financially good and its debt collectible in 1912, whatever might have been its condition when the trust and savings bank closed in June, 1914, or later. In conclusion we again announce that there is no reason or law for the receiver's proposition that the Central Trust Company is bound by the action of the receiver in compromising Huttig's indebtedness for less than its

value on October 21, 1912, and this rule applies to any debt considered in this record.

The undisputed evidence in the record is that a payment of $500 was made on John R. Norris' indebtedness November 23, 1912. Accountant Kadish testified that the books of the bank showed that the remainder of the debt was paid one day after its due date, February 15, 1913, and that he knew of nothing to indicate that it was not paid in cash in the usual and ordinary course of business.

### Division 6.

The bills receivable under this division are those of the Commercial Bond and Investment Company and the Catholic Bishop of Bismark, who owed the National Bank $50,-033.19, including accrued interest, and $39,088.68, including accrued interest, respectively. We have allowed upon these two claims the aggregate sum of $69,609.49, being full value for the debt of the Catholic Bishop of Bismark and $30,520.81 for the debt of the Commercial Bond and Investment Company. The master allowed full value for both claims. All members of the Appellate Court allowed full value for the debt of the Catholic Bishop of Bismark and two members of the court allowed $17,239.28 on the other claim, while the third member found it worthless.

The Appellate Court and the master properly allowed $17,239.28 on this indebtedness, which was realized out of the notes of the Sisters of the Holy Child of Jesus, which notes had been obtained in exchange for note No. 6940, amounting to $17,239.28, including accrued interest. The remainder of the debt ($32,793.91) went into four notes, three for $25,000 each and one for $50,000, aggregating $125,000. One of these $25,000 notes was transferred to the Ashland Twelfth Bank on December 29, 1913, and while there there was a reduction of it of $1015. Another of the $25,000 notes was credited or paid in full according to the testimony of Kadish. The other $25,000 note was

reduced by payments of $4593.30, and the balance of the note went into the hands of the receiver as a note of $20,-406.70. The $50,000 note was credited with a $20,000 reduction and the remainder of $30,000 went into the receiver's hands. The foregoing evidence shows a total reduction of the $125,000 indebtedness of $50,608.30, or 40.5 per cent. of the entire $125,000 debt. Giving the old notes proper proportion of this reduction, we find that the $32,793.91 that went into the $125,000 was reduced by said payments by the sum of $13,281.53, and this further amount should be added to the amount of the old note that was paid, which amounts to the sum of $30,520.81, which we have allowed as the value of this debt.

The record evidence amply supports the master and the Appellate Court in finding that the debt of the Catholic Bishop of Bismark was a good and collectible debt on October 21, 1912, and that the note was paid in full.

### Division 7.

The bills receivable of the Cemetery Securities Company are the only ones treated under this division. They consist of six notes, one for $100,000 and five for $5000 each, aggregating a net face value on October 21, 1912, of $121,-413.25. We have allowed full value for these notes. The master allowed full value. Two members of the Appellate Court allowed for this item $77,106.43 and the other member allowed nothing. The large note was dated June 3, 1912, due June 3, 1913. The unearned interest on that note was $3055. The other five notes were dated September 25, 1912, and were due March 25, 1913, the unearned interest on each note being $106.25, all of which were paid on the dates when they were due. There can be no serious question about the payment of the five notes under the evidence, and both the master and two members of the Appellate Court so found. The $100,000 note was renewed and came into the hands of the receiver on July 20, 1914, and

he applied the sum of $1781.43, the deposit balance of the company, on the note. This credit was properly so applied. There were other notes of the Cemetery Securities Company in the trust and savings bank that also came into the hands of the receiver, but they represented later indebtedness to the trust and savings bank, and under the Clayton rule of applying credits not directed by the debtor, the deposit account was properly applied to the oldest note. The receiver also properly applied an additional amount of $68,550 on this note, because on November 20, 1912, 228½ shares of stock of the Rosehill Cemetery Company were placed as collateral in the trust and savings bank, with a power of attorney running to the National Bank authorizing it to treat the shares as collateral security to the National Bank. The $68,550 was the amount realized by the receiver by sale of the stock under an order of the circuit court, and the receiver was not authorized to apply the same otherwise than on the debt of the National Bank, in accordance with the power of attorney aforesaid. After applying the above credit, the balance due on the $100,000 note, less unearned interest, was $26,613.07. On April 1, 1914, there was deposited as collateral for the indebtedness of the Cemetery Securities Company 124 more shares of stock of the Rosehill Cemetery Company. On that date the total liability of the Cemetery Securities Company to the trust and savings bank, including the debt to the National Bank, was $155,653.10. There is no proof that there was or was not an agreement as to how this credit should be applied, or that there was or was not a direction by the debtor as to how this credit should be applied on the indebtedness. One of the first rules in applying credits is that the debtor has the right to have his payment applied to the debt as he directs. Another rule is to the effect that if the proof shows the debtor made no such direction then the creditor may apply the credit as he sees fit, in case no third party is unjustly prejudiced. The Central Trust Company would have

had the right in this case to have the credit applied to the oldest indebtedness if it had made the proper proof. There being no proof on the subject, we have apportioned the latter payment on all the remaining indebtedness of the Cemetery Securities Company. We find that the proper amount to be applied on the National Bank's debt under the apportionment is $23,800, which would leave a balance due on the National Bank's debt of $2813.07. The receiver had no authority, as against the Central Trust Company, to transfer 66 shares of this collateral to the Marquette Insurance Company for indebtedness to it and thereby seek to defeat the Central Trust Company of its proper proportion of this security. It is a matter of little consequence, however, at this time as to how much we actually find due from the Cemetery Securities Company, as we have allowed this debt in full, or the remainder of it, because of the fact that we hold that C. B. Munday, H. W. Huttig and others were liable to the National Bank on this indebtedness.

A short history of the Rosehill Cemetery Company and of the Cemetery Securities Company will be necessary to a further understanding of our finding in this case that Munday and Huttig were liable for the debt of the Cemetery Securities Company.

Rosehill cemetery was incorporated by a special act of the legislature in 1859. By the act it was authorized to acquire 150 acres of land in Chicago for cemetery purposes. The corporation was to provide for and dispose of burial lots and for the permanent care and preservation of the cemetery. The lots were exempted from taxation, execution and judgment liens. It might receive donations and bequests. No roads or streets could be laid through the cemetery without the consent of the board of managers, by condemnation or otherwise. In 1863 the original act was amended, and as amended it provided for the acquisition of a fund of $100,000 as a perpetual care fund. The company issued 5000 shares of stock of a par value of $100

each, and for about ten years prior to 1912 it had been col-
lecting fifty cents per square foot from each purchaser of
lots, to be held in trust by the Northern Trust Company for
the preservation of the particular lots purchased. The fund
so collected was known as the perpetual care fund, and over
which the Rosehill cemetery had no control. It had another
perpetual care fund of over $700,000, the custody and man-
agement of which were under control of the officers of the
Rosehill cemetery. The Rosehill cemetery was entitled to
the interest produced from the funds for caring for the
graves but was not entitled to any portion of the principal.
The record evidence is to the effect that this cemetery is
located in a beautiful section on the north side of Chicago;
that there is a growing demand for the property by reason
of the growth of the north side of that city, and by reason
of the fact that by ordinance of the city of Chicago no new
cemetery could be created in the city and other existing cem-
eteries could not add to their area for cemetery purposes.
This ordinance could not apply to Rosehill cemetery for rea-
sons already stated, and under its charter it could still con-
demn 200 acres additional land for cemetery purposes. The
cemetery was easily accessible from all parts of the city and
its property was exempt from taxation. The contour of
the land was desirable for cemetery purposes and it was
patronized by the best citizens of the city. The ground and
surroundings were so kept and maintained that Rosehill
cemetery was regarded as one of the most beautiful ceme-
teries in the United States. The record contains the testi-
mony of various experts who had been managers of ceme-
teries in many of the large cities in the United States, each
of whom had spent from twenty to thirty years in such
work, and were well qualified to testify as such experts.
They were familiar with Rosehill cemetery, and they testi-
fied that it was considered by them as one of the leading
and best cemeteries in the United States. They were fa-
miliar with the factors that determine the value of ceme-

tery property, such as its location, demand for the property, accessibility of the grounds, management and care given the property, its protection, from a legal standpoint, in its charter provisions, the character of the patrons, the physical features, the contour of the ground and the beauty of the surroundings. The cemetery in October, 1912, had 4,779,963.40 square feet of unsold lots or more. The experts valued the unsold portion of the cemetery in 1912 at an average of $2.50 per square foot, or $11,949,908.50.

In the spring of 1913 a dispute arose between the Rosehill cemetery and the Federal government as to the amount of tax which should be paid under the Corporation Income Tax act. The unsold portion of the cemetery was then being carried on the books of the company at $482,000, the original purchase price. The government contended that the difference between the sale price of a lot and its price as carried on the books represented profit and was subject to income tax. One Harrison, an expert accountant, was employed to adjust the matter and to ascertain the actual value as of January 1, 1909, and place it on the books of the company as of that date. In this investigation he made a study of the cemetery situation in the United States for three months, taking into consideration the price that was charged in other cemeteries in the United States, including Chicago. He considered all the elements of value aforesaid. He found the total unsold portion available for burial, excluding drives and spaces reserved for ornamental purposes and twenty acres used in connection with the greenhouse, to be 5,013,114.95 square feet and fixed the value at $2.35 per square foot, or $11,789,667.60. The treasury department accepted his valuation for the purpose of taxation. He figured the probable life of the cemetery, taking into consideration the probable increase in sales and all other matters proper to be considered, and estimated that the property would be sold out in from fifteen to twenty years, or by 1933 or 1938.

Prior to May, 1912, the stock in the Rosehill cemetery was owned by the following named parties in the following amounts: Lansingh family, 2668⅓ shares; Henry S. Osborn, 300 shares; Pettibone, 137½ shares; Miner, 10 shares; Chicago Dempsters, 1853¾ shares; Rosehill Cemetery Company, 30 5/12 shares; making a total of 5000 shares.

For a number of years prior to 1912 there had been intense feeling and much litigation between the stockholders for the control of Rosehill cemetery. This same feeling seems to have existed between the two Dempster families, designated as the California and the Chicago Dempsters, and this resulted in the Lansinghs purchasing the interests of the California Dempsters in April, 1912. There was not entire harmony in the Lansingh family and they determined to sell their interest. William Freeman, the husband of Blanche Freeman, one of the Lansingh heirs, obtained an option on the Lansingh interest and he interested and finally sold the interest of the Lansinghs to C. B. Munday, H. W. Huttig, Joseph O. Morris, Jesse Briegel and Frederick L. Reynolds. The five purchasers were to have a one-fifth interest in the shares purchased by them and Munday and Huttig were to raise the money to finance the venture. The contract by the five purchasers with the Lansinghs was actually made in May, 1912, by which the entire stock of the Lansinghs was purchased for $325 per share, or for a total of $867,208.33. A cash payment of $96,208.33 was to be made, and the deferred payments (of $771,000) were to be made on October 1 and April 1 of each and every year for a period of ten years. The first payment was to be October 1, 1912, $20,000; the next eight were to be $25,000 each; the next ten to be $50,000 each, and the last payment $51,000. All payments were to bear interest at five per cent, evidenced by coupons, payable semi-annually. The interest aggregated $234,760, the total principal and interest amounting to $1,005,760.33. By their contract the

entire stock was to be deposited with the Chicago Title and Trust Company as trustee, to secure the payment of the notes, and after $150,000 was paid on the purchase price the syndicate was to be permitted to withdraw from the trustee one share for each $325 paid until 167 shares were withdrawn, and the remainder was to remain until all the indebtedness was paid. No lien was to be placed on the property of the Rosehill cemetery and no indebtedness incurred by it, except in the usual course of business, without the consent of the owners and holders of two-thirds of the principal of the notes then outstanding. The shares were to be transferred in the name of the trustee, and, unless default in payment occurred, the syndicate was to be paid the dividends of the cemetery. The trustee was to deliver proxies to the syndicate or purchasers, to vote the stock in the corporation meetings as should be requested by the purchasers.

Under a separate contract Munday and his associates purchased the shares of Pettibone and Osborn for $44,-661.46 cash and the balance in two deferred payments, $45,937.50 in November, 1912, and $44,843 in May, 1912. They also bought the stock of Miner for $3272.60 cash. They thereby secured 3115 5/6 shares of stock, which was a controlling interest, amounting to 62½ per cent of the entire stock.

On June 1, 1912, the Cemetery Securities Company was organized by the syndicate under the laws of the State of Delaware, with a capital stock of 6000 shares, no par value. The object of this organization was to acquire and hold the shares of stock in the Rosehill cemetery purchased by them. One thousand shares of stock were issued to each one of the purchasers except Morris, to whom were issued 994 shares. Three shares were issued to each of two other parties for the purpose of providing the seven directors, but the stock was to belong to Morris. One thousand of the shares remained in the treasury. By an

arrangement among the members of the syndicate no one of them was to receive any of the dividends or profits of the cemetery until their contracts for the purchase of the stock were paid in full. Munday and Huttig were to be paid in full for all the money they advanced in payment of the contracts, and thereafter each member of the syndicate was to be an equal owner of the stock and of its profits. It was the expectation of all the members of the syndicate that after the Pettibone and Osborn contract had been paid and a few payments had been made on the Lansingh contract their portions of the dividends from Rosehill cemetery would of themselves discharge the remainder of the Lansingh contract, and the evidence in this record clearly shows that their expectations would have been fully realized except for the unexpected crash and closing of the trust and savings bank in June, 1914, and other similar occurrences which closed up and put out of business all the various businesses and concerns with which Munday was connected. Munday was a very wealthy man in 1912 and previous years, and under the showing in this record was worth at least a half million dollars or more; but the facts are that he was connected with so many interests or business concerns which so constantly and persistently drew on him for money that he was not able to meet the demands, and his bank was not able to resist the opposition naturally engendered by his diverse business interests in Chicago and elsewhere and by the many losses he sustained after October 21, 1912. The Rosehill cemetery dividends actually declared and paid in 1908 were $49,695.85; 1909, $79,513.34; 1910, $89,452.48; 1911, $79,513.34; 1912, $29,817.51; and 1913, $99,396.66. In 1912 there were heavy expenses in building a new greenhouse, and other expenses. The dividends were increasing yearly, and one of the experts in his calculation estimated that under normal conditions the dividends that would have gone to the syndicate from 1912 to 1922 (the period of the Lansingh con-

tract) would have amounted to $1,028,000, or about $23,-000 more than was necessary to have discharged the Lansingh contract. He further estimated that at the end of 1922 there would have remained about 4,035,745 square feet of unsold land; that at $1.69 per square foot,—the average selling price for the seven-year period from 1910 to 1916, inclusive,—the value of the unsold land at that time would be $6,850,409.05. He made this computation in 1917, when the books for that year had not been closed. After the books were audited for the years 1917 and 1918 the actual facts indicate results larger than his estimates for those years.

Up to October 21, 1912, Munday and Huttig had paid on the contract of purchase a total of $199,033.41. Of this amount Munday raised $100,000 and Huttig $59,-585.51. The remainder was raised by the Cemetery Securities Company by borrowing from the Bank of Bethalto and the National Bank. The last loan is represented by the five $5000 notes we have above considered as a part of the indebtedness of the Cemetery Securities Company to the National Bank, which notes, when discounted by the bank, produced $24,447.90. For the money which Munday raised, the Cemetery Securities Company made to him a note for $100,000, which he agreed with his associates he would not discount to any bank, and particularly to the National Bank. This $100,000 note represents the large note above considered by us as the debt of the Cemetery Securities Company to the National Bank, and which was discounted by Munday to the bank in violation of his agreement.

Under the management of the syndicate the Rosehill Cemetery Company constructed what is referred to in the record as a community mausoleum. The building of the mausoleum required 57,660 square feet of ground of the cemetery. Much has been said about this mausoleum and its construction, but the undisputed testimony is to the ef-

fect that this improvement will add a value of $1.50 per square foot on 1,500,000 square feet of the Rosehill cemetery ground, or $2,500,000. The highest priced property in Rosehill cemetery prior to 1911 was $2.50 per square foot, including fifty cents for perpetual care fund. From the testimony of the witness referred to, it appears that the 1,500,000 square feet around and near the mausoleum will be sold for from $4 to $6 per square foot, including fifty cents per square foot for perpetual care. The total expenditure on the mausoleum for the years from 1913 to 1916, inclusive, including cost of ground, cost of building and other expenses, was $495,173.63. The total receipts for the same years for sales of space in the mausoleum were $576,148.08, and the total net receipts, less the perpetual care fund, were $22,030.45, showing a net profit to the stockholders on the mausoleum of the latter amount. One of the expert witnesses estimated that the net receipts or profits from the mausoleum to the stockholders for the years from 1917 to 1920, inclusive, and also including the net receipts already mentioned, would amount to $233,-943.57, or that amount of profits to the stockholders, assuming the sales to be equal to the 1916 sales, until all space was sold, in 1920. The books of the Rosehill cemetery actually showed as a net profit from all sources for distribution to stockholders in 1916, the sum of $123,537.37. It was the building of the mausoleum that diverted the syndicate's share of the dividends of the Rosehill cemetery and caused it to borrow large sums of money it would otherwise not have borrowed, and this is the real reason that the Cemetery Securities Company was found to owe so heavily in June, 1914, when the bank closed.

After the closing of the trust and savings bank the Chicago Title and Trust Company was appointed receiver for the Rosehill cemetery, and a suit was instituted by the Dempsters to regain control of the cemetery, alleging improper management of Munday and his associates and the

312—30

looting of its treasury by them. We have already suffi-
ciently discussed the result of their mismanagement of the
Rosehill cemetery. The final result of the litigation was
that the Dempsters bought at forced sale all the shares
purchased by the syndicate from the Lansinghs. The syn-
dicate at this time owned in the name of the Cemetery Se-
curities Company 573½ shares of stock, including the num-
ber of shares it had withdrawn under the provisions of the
Lansingh contract, and the Pettibone, Osborn and Miner
shares it had purchased and paid for, except two shares
sold to one Wallis. Of the 571½ shares owned by the
syndicate, 219 were held by the Rosehill Cemetery Com-
pany as collateral to a $65,700 note of the Cemetery Se-
curities Company payable to it. The remainder of 352½
shares were held by the trust and savings bank, 66 of which
it transferred to the Marquette National Fire Insurance
Company, as already stated. The Dempsters also became
the owners of all of the 571½ shares owned by the syn-
dicate after it had purchased the Lansingh shares. The
showing in the record is that the Dempsters paid for the
Lansingh shares, including the amount of $131,575.86 the
court decreed they should pay into the treasury of the Rose-
hill cemetery to make good "the loot" of its treasury by
the syndicate, a little more than $350 per share. The re-
ceiver in this case contracted with the Dempsters to sell
all the shares held by it at $300 per share, while all the
other shares purchased by them at forced sale cost them
$350 per share. The shares were undoubtedly worth what
the Dempsters paid for them, and if the receiver had sold
them for $350 per share,—the amount the Dempsters con-
sidered them worth,—the amount of the National Bank's
debt already considered would have been fully paid to the
receiver and also several thousand dollars more on the
notes of the Cemetery Securities Company held by the trust
and savings bank. But the facts are undisputed that the
Dempsters only paid $300 per share for the entire 571½

shares held by the syndicate in the name of the Cemetery Securities Company, and they only received credit at this rate on the entire indebtedness, which will be stated later. The average purchase price for the entire shares acquired by the Dempsters, as above stated, was a little more than $348 per share. The further facts are that the Dempsters in 1914 refused to take $350 per share for their holdings to Munday and his associates, and refused absolutely to sell to the syndicate for less than $400 per share. We must therefore necessarily conclude from the evidence in the record that the Dempsters considered that the stock in the Rosehill Cemetery Company was worth $400 per share in 1914, and there is nothing in the record to indicate that it was worth less at any time after 1914. The evidence does show that the stock was worth much more than that by reason of the fact that the mausoleum turned out to be such a valuable asset to the cemetery.

The facts concerning the alleged looting of the treasury of the Rosehill Cemetery Company by Munday and his associates, so far as we can gather them from the record, are in substance the following: Having elected the directors of the corporation they were able to control the corporation and transact its business. They caused it to sell a large amount of its stocks, bonds and other securities that were in the perpetual care fund, which at that time was more than $700,000. According to the statement of the receiver, the amount of securities so sold amounted to $221,500. Munday and his associates substituted other securities for those so sold, which were: $19,000 of the certificates of deposit of the Bank of Smithboro, $100,000 of the bonds of the Litchfield Mill and Elevator Company, $60,000 of the preferred stock of the Huttig Manufacturing Company, $20,000 of other bonds, and $22,500 in notes and mortgages of the wives of Morris and Reynolds. The cash realized from the proceeds of the sale of the bonds and stocks of the perpetual care fund was deposited in the trust

and savings bank. As we understand the record, the trust
and savings bank issued its certificates of deposit to the
amount of $125,000 drawing three per cent interest on their
face, with an agreement on the side that six per cent in-
terest would be paid to the Rosehill cemetery to secure the
cash deposited in the bank. It appears, also, that Munday
issued certificates of deposit amounting to $51,000 on the
Bank of Smithboro to the Rosehill Cemetery Company.
The record is not very clear as to just how many securities,
from first to last, were thus given the Rosehill Cemetery
Company to secure the perpetual care fund or cash belong-
ing to that fund, but the evidence is clear as to just how
many of these securities so given by Munday and the trust
and savings bank remained unpaid. When Munday's as-
sociates turned the management of Rosehill cemetery over
to the receiver appointed by the court, the Rosehill Ceme-
tery Company held the following of the above securities
that were unpaid: $100,000 Litchfield Mill and Elevator
Company bonds, $60,000 preferred stock of the Huttig
Manufacturing Company, and $71,000 of the certificates of
deposit of the Bank of Smithboro. The witness on whom
we rely for this information is Joseph O. Morris, who also
testified that the Reynolds mortgage, when it was fore-
closed, was insufficient to satisfy Reynolds' note by about
$2000 or $3000. This testimony, so far as we are able to
find, is undisputed, and the total securities so placed in the
care fund not completely paid off in June, 1914, could not
be, under Morris' testimony, more than $234,000. The
circuit court only found the deficiency in the perpetual care
fund to be made good by the Dempsters to be $131,575.86,
and decreed in the final disposition of the litigation by the
Dempsters against Munday, Huttig and others, that the
Dempsters should make good the above deficiency by ap-
plying future dividends of the Rosehill Cemetery Company
until the deficiency was discharged. We cannot make it
out definitely from the record, but we assume that the above

amount represents the entire amount that the court found was unsettled by the syndicate and not good enough security for the perpetual care fund. Assuming that this is the total amount of the "loot" or loss, or even that the $234,000 was an entire loss to the Rosehill cemetery, it is very clear that under the management of the syndicate the stock of the company was worth more than it was in 1912, when it took hold of it, by reason of the gains to the cemetery by the building of the mausoleum and greenhouse under its management. We may further say here that the syndicate saved the Rosehill cemetery a loss of several thousand dollars by disposing of $25,000 worth of bonds of the St. Louis and San Francisco, Kansas City, Mexico and Orient bonds that were in the perpetual care fund as securities, as that railroad company, known as the Frisco road, went into the hands of a receiver within a very short time after the bonds were sold and its bonds became very greatly depreciated. There were also other bonds that the syndicate sold and by such sales similar losses were saved to the Rosehill Cemetery Company. The reason for selling the bonds was because of the fact they were adjudged by the syndicate to have become of doubtful value.

The Cemetery Securities Company owed the following notes in June, 1914, when the trust and savings bank closed, and which were made for part of the cash raised by the syndicate to apply on stocks purchased by them: $100,000 to the National Bank; $35,000 to the trust and savings bank; $20,000 to the Broadway State Bank; $10,000 to the Illinois State Bank; $20,000 to the Marquette Insurance Company; $50,000 to the trust and savings bank, borrowed by Huttig, Morris and Reynolds; $60,000 to H. W. Huttig direct; and $65,700 to the Rosehill cemetery,—making a total of $360,000, $100,000 of which was owed direct to Munday and which was discounted by him to the National Bank. As has already been shown, the Rosehill cemetery was fully secured on its indebtedness,

and the Marquette Insurance Company, the National Bank and the trust and savings bank were partially secured, by 352½ shares of stock of the cemetery. If the receiver had received $350 per share, (the amount paid by the Dempsters for the Lansingh interest,) and if the same price had been paid for the shares held by the Rosehill cemetery to secure its debt, the total indebtedness would have been reduced to $180,025, and $60,000 of this remainder is owing direct to H. W. Huttig, a member of the syndicate.

The master has found from the record that the total shares owned by the syndicate were worth, over and above all the debts it had incurred by the purchase of the stock, $561,417.87, and that the value of each member's stock in that company was one-fifth of that amount, or $112,283.57. The master's estimate is apparently a conservative estimate of the value of the shares, and would be supported by the record evidence if it were not for the further fact that Munday and his associates after 1912 were not financially able to finance and pay out their investment. In considering and determining the value of their shares on October 21, 1912, and in June, 1914, their financial condition at those times must be considered. The record evidence shows that Morris, Huttig and Reynolds undertook to make disposition of their interests in the Rosehill Cemetery Company, and that they had on several occasions interested parties who desired to buy their interests and who were financially able to do so but were deterred from doing so by parties who were apparently interested for others and in seeing to it that no such sales should be made. Munday was then a bankrupt, and by reason of his inability after October, 1912, to finance all of his interests, his interest in the Cemetery Securities Company and the interests of the syndicate were sacrificed by Munday's misfortune. But we are only interested in this discussion in passing upon their ability to sell their interests in the Rosehill Cemetery Company on or before October 21, 1912, and to pay their in-

debtedness up to October, 1912, which, as already stated, is $199,033.41. We have no hesitancy in saying that the record evidence is such that it is morally certain that the Dempsters at any time before October 21, 1912, would have paid the members of the syndicate for their interests every dollar invested in Rosehill cemetery stock and have taken their contract off their hands at their contract price. The Chicago Dempsters knew better than anyone else, other than the syndicate, the value of the syndicate's investment in the Rosehill cemetery. The payment by the Dempsters of $350 per share for the Lansingh stock in 1915, and the fact that they had refused to accept that price for their shares in 1914 and refused to sell for less than $400 per share, is very significant evidence that the Dempsters would have been glad to have gotten the syndicate's interest for all, and even more than, it had invested in October, 1912. We do not believe, under the evidence, that the syndicate would have been able to realize very much more, even from the Dempsters, than the amount invested by the syndicate in October, 1912. The record furnishes no evidence that the snydicate could have sold it for very much more than the amount of its indebtedness to any other purchaser. We therefore conclude that Munday's and Huttig's interests in October, 1912, were worth all that they had invested in the cemetery stock, and they are the only ones of the syndicate who had invested any money up to that time. Munday and Huttig were to have their money invested before any of the other members were to receive anything. We have therefore valued the notes of the Cemetery Securities Company to the National Bank at full value, and for two reasons: First, we think the evidence shows that the receiver could have realized from the Dempsters as much as they paid for the Lansingh stock, $350 per share, which would have satisfied in full, as we have already shown, the entire indebtedness to the National Bank of the Cemetery Securities Company. Second, the Cemetery Securities Company un-

der the laws of Illinois, being a foreign corporation, could not lawfully hold stock in a resident corporation of Illinois. The ownership of the shares of stock of the Rosehill Cemetery Company was therefore in the snydicate, or in the individuals who formed the Cemetery Securities Company in the corporation. Munday indorsed or discounted the note for $100,000 given him by the Cemetery Securities Company to the National Bank, and he was unquestionably liable to the National Bank on that note and was solvent on October 21, 1912, as we will hereafter find.

### *Division 8.*

Bills receivable considered under this division are notes of the following parties in the following named amounts: Jesse Briegel, $10,035; William S. Freeman, $5492.63; Joseph O. Morris, $3079.45; and Frederick L. Reynolds, $3512.25. The master allowed all of these claims in full, and the main ground for this allowance as to the claims of Briegel, Morris and Reynolds was his finding that the interest of each one of those parties in the Rosehill cemetery was worth the sum of $112,283.57. He found that Freeman was solvent on October 21, 1912, and the claims against him collectible. The Appellate Court allowed nothing for the debts of Briegel and Morris. Two members of the Appellate Court allowed $1000 on the claim of Freeman and $500 on the claim of Reynolds. The third member of that court found all four of the claims to be worthless. We find the notes of Briegel and Freeman to be of full face value, the notes of Reynolds to be of the value of $650, and the notes of Morris to be uncollectible or worthless. Our aggregate value for all the notes in this division is $16,177.63.

The testimony of Briegel is to the effect that he only owed, in addition to the above notes, about $21,000 or $22,000; that he owned personal property, consisting of furniture, rugs, paintings and jewelry, of the value of $10,000, and had about $2000 or $3000 in cash on October 21, 1912.

He also claimed to be the owner of $10,000 worth of bank stock in a Texas bank. The above note of $10,035, according to his testimony, was secured by the bank stock which Munday bought for him and which was placed in the National Bank as collateral for the note. The record evidence corroborates Briegel to the effect that the $10,000 borrowed by him from the National Bank paid for the Texas bank stock, and that he was either entitled to the bank stock, which should be included in his assets, or that the note must be regarded as an accommodation for Munday and charged as a Munday liability. The receiver states that it was evident that this note was merely an accommodation note executed by Briegel for Munday's benefit, for which Briegel never received any consideration, and that Munday subsequently sold the stock but did not pay Briegel's note. Briegel's note was surrendered to him and the indebtedness was transferred to the account of the Commercial Bond and Investment Company, one of the corporations of Munday and Huttig. That corporation never paid the note and was at the time of the transfer insolvent, as we have already found. We have allowed this note in full as an indebtedness of Munday and have charged the same to him as a liability.

The sum of $1000 was actually paid by William S. Freeman on his note to the National Bank, as found by the master and the Appellate Court, on the due date of the note by debiting his deposit account with that sum, he having over $1300 on deposit on that date. The remainder of this debt was paid March 25, 1913, by the Cemetery Securities Company by a check on its deposit account in the trust and savings bank and the note was taken up by Freeman. The receiver claims that this was a mere substitution of one worthless debt for another and that the Cemetery Securities Company was not good for the amount. The note was nevertheless paid out of the deposit balance of the Cemetery Securities Company in the bank, and on the same day it

also paid $25,000 of its own debts to the bank of $180,000 which it had owed since November 20, 1912, and thereby reduced its indebtedness to $155,000. The indebtedness of the Cemetery Securities Company did not at any time thereafter increase to the amount of $180,000, and the claim of the receiver cannot be sustained. It is unnecessary in the view we take of it to go into the question of the solvency or insolvency of Freeman as disclosed by his evidence.

We agree with the Appellate Court that nothing can be allowed on the debt of Joseph O. Morris. From his own testimony he owed between $90,000 and $100,000, and was that much short in his ability to pay his debts, except for a few credits and other matters that were due him or things that he had "that were lying around loose." He gives no testimony that would indicate that there was any certainty of realizing anything out of his property or credits to pay on his indebtedness. He had a good law practice that apparently netted him, above expenses, about $15,000 a year. He had been owing a great deal more in prior years and had greatly reduced his debts. His testimony impresses us with the idea that he is truthful and honest and disposed to pay all that he owes. He has never gone into bankruptcy or attempted to evade his debts. Outside of his interest in the Cemetery Securities Company and his law practice he has no assurance of being able to pay his debts. In short, his ability to pay out depends upon his health and his law practice, as we have already found that his interest in the Cemetery Securities Company, which is now all canceled, will amount to nothing at the highest price that it could ever have been sold for, after all the debts of the syndicate and the Cemetery Securities Company are discharged.

The evidence in the record shows that $500 was paid on the note of Frederick L. Reynolds on February 3, 1913. His note was renewed for $3000 on April 9, 1913, and the interest was paid on it to June, 1914. There were 34 shares

of Bear River Paper and Bag Company stock and $4000 of six per cent bonds of the same company put up as collateral with this note. The evidence discloses that that company went into the hands of a receiver in October, 1912, and after its affairs were wound up there would be a $200 dividend, only, which the receiver may realize out of the collateral, and that it will probably be three years and a half after June, 1914, until this amount is collected from the receiver of the Bear River Paper and Bag Company. Reducing this payment to present value as of the date the interest was paid up on this note, the credit will extinguish only $150 more of the debt. We have therefore allowed $650 as the full value of this note. We further find that the evidence in the record sustains the Appellate Court in finding that Reynolds was insolvent on October 21, 1912. His only real expectancy of being financially able to pay this debt was from his interest in the Rosehill Cemetery Company, which we have already found to be of no further value to him.

### Division 9.

Under this division, which the Appellate Court refers to as "Bills receivable transferred to subsidiary banks," the Appellate Court simply makes the statement that the bills receivable belonging in this division were considered under the previous divisions and that no further reference to them need be made. The banks known as the subsidiary banks were organized by Munday and others after the trust and savings bank had begun business, and were the Illinois State Bank of Chicago, the Ashland Twelfth State Bank, the Broadway State Bank, the State Bank of Calumet, the A. H. Hill & Company State Bank, and the International Trust and Savings Bank. The trust and savings bank furnished the capital and surplus of all these banks, or a large part thereof, and gave to each bank cash and also worthless notes to make up the amount of cash it was to fur-

nish. It also appears that from time to time after these subsidiary banks were organized the trust and savings bank would transfer to them worthless claims, in some instances indorsed in the regular way, while in other instances this paper was indorsed without recourse. There are quite a number of these transactions discussed by the receiver, but his principal cause of complaint is the allowance by the master of some of these worthless claims that were thus indorsed to these banks as good claims, the claims being charged to the deposit accounts of the subsidiary banks. We have no need to further discuss these subsidiary banks or the dealings of the trust and savings bank with them, as we have allowed no claim simply because of the fact that it was transferred to a subsidiary bank without recourse, or otherwise, and charged to its deposit account. The record indicates the transfer backwards and forwards of a great number of these worthless claims on the part of the trust and savings bank and its subsidiary banks, and we have refused for that reason to allow any notes or claims of the National Bank which were transferred to subsidiary banks that were of themselves worthless, unless those claims were collected or partially collected after they went into the hands of the subsidiary banks. Several of these banks have filed claims against the trust and savings bank for worthless paper thus assigned, and we are unauthorized to allow any claim so assigned unless the proof shows that the note was collectible or collected and resulted to the benefit of the creditors.

## *Division 10.*

The bills receivable considered under this division are those exchanged for paper of Sidney Long & Co., and are bills receivable of the following named parties in the following amounts: J. W. Crawford, $2229.57; Charles E. Erbstein, $3211.20; Inter-Ocean Paving and Construction Company, $2308.05; Kessel Bros., $495.92; Morrison

Publishing Company, $2018.67; and W. H. Smith, $2018.67. The master allowed all six of the claims in full except that of the Morrison Publishing Company, on which he allowed the sum of $1486.55. Two members of the Appellate Court made the following allowances: J. W. Crawford, $329.97; Charles E. Erbstein, $475.25; Inter-Ocean Paving and Construction Company, $1033.63; Kessel Bros., $372.20; Morrison Publishing Company, $296; and W. H. Smith, $313.76,—the allowance in every case being 14.8 per cent of the amount of the notes, except the note of Kessel Bros., on which there was a payment of $350 and an allowance of 14.8 per cent of the remainder, making a total allowance for that note of $372.20. The other member of the Appellate Court found all the notes to be worthless. We have allowed the same amount on every one of the notes as allowed by the two members of the Appellate Court, making an aggregate allowance of $2820.81 for this division.

As to the Crawford note, the evidence in the record does sustain the findings of the master that the National Bank had a mortgage of Crawford and wife on real estate of the value of from $3500 to $4000, but this note and mortgage was subject to a lien of two other notes and mortgages of the face value of $1450. The evidence clearly discloses that had the bank sought to foreclose this mortgage the litigation would have been contested and that whatever decree might have been gotten would have been subject to the other two notes, with interest. There is nothing like certainty or reasonable probability that the bank or the receiver could have realized anything by the litigation, over and above costs and expenses, on a public sale of the property. The record discloses that this note and the other five notes above described were eliminated from the bank on January 2, 1914, by including them in two notes given by Sidney Long & Co. for $10,000 and $25,000, respectively, and that, including these two notes, Sidney Long &

Co. owed the bank when it was closed, $58,580. The receiver collected on all of this indebtedness $8712.92. There is no proof in the record except the foregoing, and we hold that the master was not warranted in applying all of this credit on the six notes on the ground, simply, that they were the earliest indebtedness. The Appellate Court allowed all that was warranted by apportioning the credit and applying it to the indebtedness of the National Bank and the trust and savings bank in proportion to the respective amounts due each. The six notes were all uncollectible before they went into the Sidney Long & Co. notes, and nothing was ever paid on them by the original debtors except the $350 payment on the Kessel Bros. note. We therefore sustain the action of the Appellate Court.

### *Division 11.*

Under this division twenty-six items are considered and designated as items not considered in the previous divisions. There were ten of them that were found to be worthless by both the master and the Appellate Court, and those ten claims were on the following parties in the following amounts: Edmund Bilyou, $300; Builders Bond Company, $8000; F. A. Bridge, $13,540.54; Howard D. Casey & Co., $2000; Conkling & Co., $1200; J. F. Conant, $1015; Consumers Battery Company, $1000; C. S. Hearn, $600; M. S. Kaplan, $4640.15; and Russell-Kelly Company, $2500, all aggregating $34,795.69. The evidence in the record supports the master and the Appellate Court, and we find them to be worthless.

There are twelve other items considered in this division upon which there were only partial payments made and on which the master and two members of the Appellate Court allowed the claims for the amount of the payments made without deducting interest or reducing the payment to present value for the time between October 21, 1912, and the date of payment. We concur with the master and the Ap-

pellate Court that the payments were made as found by them and that the payments represent the only values in the claims. We have, however, reduced the payments to present values, and we find the present value in each case to be the value of the claim. The following are the names of those twelve parties, followed by the amount of the debt they owed, the amount of the payments made by them on their debt and the amounts we have allowed on the same:

| | | | |
|---|---|---|---|
| 1. Augustinian Society | $21,296.41 | $3,000.00 | $2,650.00 |
| 2. Peter Bartzen & Son | 1,414.00 | 404.86 | 345.00 |
| 3. Alexander J. Burke | 300.00 | 75.00 | 72.00 |
| 4. Charles L. Daly | 150.00 | 100.00 | 95.00 |
| 5. John W. Farley & Co | 500.00 | 36.89 | 36.89 |
| 6. Krell-Auto Grand Piano Co. | 23,371.50 | 3,723.24 | 3,510.00 |
| 7. A. J. Lieberman | 1,718.15 | 489.80 | 435.50 |
| 8. D. H. Nichols | 447.92 | 46.92 | 43.50 |
| 9. Fred Overhew | 300.00 | 168.87 | 140.00 |
| 10. H. E. Overstreet | 300.00 | 1.05 | 1.05 |
| 11. Smokeless Furn. & Stove Co. | 2,090.29 | 7.29 | 7.29 |
| 12. Joseph J. Thompson | 213.20 | 60.00 | 50.00 |

The third member of the Appellate Court agreed with the other two members on Nos. 3, 5, 8, 10, 11 and 12 of the above named twelve items and found the remainder thereof to be worthless. As to the claim of Cameron & Co., whose debt was $5373.74, the payment made by them was $500 and the allowance by the master and two members of the Appellate Court was $495. The other member of the Appellate Court allowed nothing. There was a payment of $500 made on this note as found by the master and two members of the Appellate Court, and the claim should be allowed in the sum of $497.40 after reducing it to present value. The claim of Gertrude P. Meyers in this division is for $1987.84, but the note was not due on October 21, 1912, and consequently the deposit balance of $241.24 on that date could not be set off against the note. The bank did credit her deposit balance of $46.22 December 28, 1912, at which latter date the note was due. The master allowed $241.24 on this claim by applying the deposit of October 21,

1912, as a set-off, which was error. The Appellate Court allowed nothing. We have allowed the note for the amount of her deposit balance on December 28, 1912, less interest to reduce it to present value, or $45.70. The claim of J. M. Lavin has been fully discussed under Division 3, where we allowed it in the sum of $1140, and it is not necessary to further discuss it here except to state that we allow nothing for it under this division. We allow the William Webb note in full for $1987.67, for the reason that William Lorimer, Sr., was also responsible for this note and was solvent, in accordance with our finding under Division 4. Lorimer directed Webb to borrow the money to buy run-down horses to put on Lorimer's farm, and they were to share equally the profits in the sale of the horses after they had recuperated and were sold at a profit. Lorimer was liable for this debt, and both the Appellate Court and master charged him with the note as his liability in discussing Lorimer's account, but under this division the master refused to allow this note in full, although he found Lorimer to be solvent, and only allowed $22.82, the amount of Webb's deposit on October 21, 1912. The Appellate Court has allowed nothing on this claim. The total amount that we have allowed for this division is $9917.10.

## Division 12.

The bills receivable in this division are twenty-eight in number and are simply designated as other bills receivable not included in the preceding divisions. Of these bills receivable the master and two members of the Appellate Court allowed in full those of the following persons in the following amounts: City Waste Manufacturing Company, direct liability $5820.30, indirect liability $2576.92; A. Wayne Dahl, $74.73; M. L. Fox, direct liability $3486.43, indirect liability $4089.47; David L. Frank, $3511.59; A. W. Friese, $238.90; William M. Gunton & Co., direct liability $11,189.71, indirect liability $3034.19; A. J. Harris,

$3599.53; Imperial Mining Company, $25,087.50; Vivian Collieries Company, $25,087.50; T. J. O'Gara, $25,042,— all three considered as one claim; McVoy Hardware Company, $13,991.92; Edward J. Novak, $498.50; and E. H. Trabue, $8866.61. The third member of the court agreed with the master and the other two members of the court on the claims of the City Waste Manufacturing Company, Dahl, O'Gara, Novak and Trabue. He allowed in full the indirect liability of Fox, the sum of $501.41 on the claim of Frank and nothing on the remainder of the above claims. We concur with the master and the two members of the Appellate Court and allow these claims in full. They were all either paid in full, well secured, or the debtors were actually solvent and well able to pay their debts, and we think further comments are unnecessary.

The Appellate Court found the claim of C. H. and Viola R. Burke for $1127.80 to be worthless, and we concur in that finding. Persistent and repeated demands by the bank on these debtors failed to collect any part of this debt, and the record does not sustain the master, who allowed this claim in full, in his finding that it was collectible.

On the claim of Burrows, Ennes & Kirkpatrick for $5352.32 direct liability and $1007.67 indirect liability, we have allowed $2941.21 on the direct liability. The testimony of Kadish, and other evidence in the record, is to the effect that $2030 of the amount of note No. 8667, for $4100, was discharged by payment; that the note was a demand note, and that the further sum of $911.21 could have been realized by the bank on October 22, 1912, by applying the deposit balance of the debtors on the note, which deposit balance was in the bank on October 21 and 22, 1912. The record does not sustain the claim that any further payments were made on this note except out of proceeds of other notes for money borrowed of the trust and savings bank, which were not afterwards collected and resulted in no benefit to the bank or to creditors. The tes-

312—31

timony of Kadish shows that the indirect liability was all paid in the due course of business, and we allow it in full. The master allowed both the direct and indirect liabilities in full. The Appellate Court allowed nothing on either liability.

The debt of A. J. Carey and J. Gray Lucas for $785.60 was of the value of $656.29,—the amount of Carey's deposit October 21 and 22, 1912. The note was a demand note, and the deposit was in Carey's name without notice to the bank that it was a trust fund. The claim of the receiver that it was not subject to be made a set-off because it was a trust fund is therefore untenable. The evidence does not show the remainder of the note collectible. The master allowed it in full and the Appellate Court allowed nothing.

The debtor Chester W. Church, who owed $1500.42, was the owner of real estate subject to execution and which was amply sufficient to satisfy and pay all debts that he owed, including his debt to the National Bank, if proper diligence had been used by the bank in making collection of this claim. We therefore concur with the master in allowing full value for the claim. The Appellate Court allowed nothing.

The testimony of Kadish shows that notes Nos. 7972 and 8357 of E. M. Forbes, aggregating $1008.47, were paid in full in June and September, 1913. The amounts of his notes Nos. 7832, 8465, 8864 and 8724 were reduced $190.03, $101.83, $48 and $82.83, respectively. By the foregoing payments he reduced the amount of his indebtedness to the bank in the sum of $1431.16. The remainder of the unpaid notes was carried into other notes, by which his indebtedness was increased and reduced from time to time. It appears from the testimony of Kadish that the notes into which the remainder of note No. 8864 was carried were ultimately paid in full. By the payment of the remainder of this note his debt was reduced by the fur-

ther sum of $131.33, showing a total reduction of his indebtedness of $2894.79 by payments of $1562.39, which we allow as the full value of this claim. No further allowance can be made because it does not appear that the notes into which the remainder of his debt was carried were reduced except by money borrowed from the bank. His debt on March 17, 1914, was $1829.90, and was never less than that sum after October 21, 1912. The master allowed the sum of $2550.70 on this indebtedness and the Appellate Court allowed nothing.

The master and all members of the Appellate Court allowed in full the direct liability of B. M. Levine & Co., amounting to $2207.70, on the evidence in the record that the direct liability was paid in full, and we concur in that finding. We concur in the finding of the Appellate Court that nothing should be allowed on the indirect liability of $2612.92. The master erred in finding that the testimony of Kadish showed that the indirect liability was paid in full. Kadish's testimony shows that it was not so paid.

The Appellate Court and the master allowed full value for the direct liability of Lipschitz & Turner in the sum of $249.75, and the evidence sustains their finding that it was paid in the due and ordinary course of business. The testimony of Kadish found in the abstract at page 567 is to the effect that all of the indirect liability was paid, and we therefore allow the indirect liability in full, $822.74, as the master has done. The Appellate Court allowed nothing on the indirect liability.

The master allowed full value on the claim of J. M. Logan for $740.12. Two members of the Appellate Court allowed $150, being the amount paid on the note. The other member of the Appellate Court allowed nothing. The note was reduced $100 on January 6, 1913, the due date of the note, and another note given for $650, on which there was a payment of $60 in April, 1913. The note was never less than that sum thereafter and was uncollectible

under the evidence in this record. We have allowed $146.60, the total amount the indebtedness was reduced, including interest, after reducing the payments to present values.

As to the indebtedness of Neely & Peacock of $6539.46, we find from the record evidence that notes Nos. 8021 and 8152 were paid in full, the amount of those notes being $1711.10. There was a total reduction of $295.60 on note No. 8228 by payments. There was a total reduction of note No. 8269 of $291.67 after it became a part of a $2400 note. Note No. 8359 was reduced by the amount of $285.99 before it became a part of a note of $3150. There was a total reduction of the amounts of notes Nos. 8591 and 8649 of $1720.77 before they went into the $3150 note. The note for $3150 was dated March 25, 1914, due on demand, and went into the hands of the receiver after it had been credited by a further payment of $353.88. This note included all the old notes to the National Bank that were unpaid and further indebtedness by loans of the trust and savings bank. There was $307.06 credited by the receiver on the note as of June 11, 1914, being the amount of the deposit of Neely & Peacock. The receiver also made other small collections on the note, which with the deposit balance amounted to $728.09. The master applied the doctrine of the Clayton rule, and found that all the notes that were in the bank on October 21, 1912, were paid in full. There is no evidence in the record to warrant the application of the Clayton rule, and under the evidence which is already recited we have found that the Central Trust Company is only entitled to have applied on the old indebtedness to the National Bank the amount of $800, which we find to be the proper proportion of the credit which should be applied on the old indebtedness, which, added to the other amounts paid on this indebtedness, makes a total of $5135.13. The Appellate Court allowed $4436.43 as the value of this claim by simply taking the balance due June

12, 1914, from the debt of October 21, 1912. Fred W. Neely is clearly shown by the evidence to be worth more than $11,000 after deducting all of ·his indebtedness except this debt, including the increased additional indebtedness over October 21, 1912. He was liable as indorser on the $3150 note and all the other notes. This testimony is not contradicted, and shows clearly that the receiver can collect full amount of this amount due from Neely by simply instituting suit. We therefore allow this claim in the sum of $6289.46 after deducting from the full amount of the debt $250, which we have found to be a reasonable attorney's fee for collecting the remainder of the debt from Neely, which action on our part will be further explained in the latter part of this opinion.

Under the evidence we find that note No. 6221 of August W. Nohe for $2508.75 was renewed December 24, 1912, into a $2500 note, and on May 8, 1914, was transferred to the International Trust and Savings Bank. This note was therefore reduced in amount $8.75, or the accrued interest up to October 21, 1912. The evidence further shows that there was a reduction of note No. 7268 of $1012.50, including accrued interest, for which sum this note is entitled to an allowance. Note No. 8575 is entitled to a total reduction of $939.17 by payments. The remainder of this indebtedness came into the hands of the receiver, and it appears that the interest was paid up to June 11, 1914. The total reduction by actual payments on this indebtedness was $1960.42. The testimony of Kadish makes it clear that the reduction above mentioned was made by actual payments on the notes. The testimony of Nohe makes it very doubtful whether or not any more of his debt, all of which amounted to $9960.42, could have been collected from him after October 21, 1912. He had a deposit balance on October 21 and 22, 1912, of $704.44, which the trust and savings bank should have applied in discharge of his notes, as it was well known at that time that he was not good for

the notes. We have therefore added this further sum to the amount actually paid and find this indebtedness to have the value of $2664.86. The master allowed the note in full that was transferred to the International Trust and Savings Bank, on the theory that the trust and savings bank collected full value for it by charging it to the deposit balance of said bank. There is no evidence that anything further was ever paid on this note after it was transferred to the above bank, which was one of the subsidiary banks that we have already discussed. Two members of the Appellate Court allowed $1951.67, the amount of the payments made, except that they omitted to note that the accrued interest was paid on the first note above mentioned. The third member of the Appellate Court allowed nothing on this debt.

Otto J. Novak's liability was on two notes amounting to $2207.70. The amount due on the first, plus accrued interest, was $200.70, and it has not been paid. The other note amounted to $2007, plus accrued interest. Both notes came into the hands of the receiver. One Moxley was sued by the receiver as an indorser on the second note and judgment was recovered for the full amount of $2837.34. Moxley set off the amount of his deposit account against the judgment and thereby satisfied the judgment. The master allowed thirty-five per cent of this amount only, because Moxley, as a creditor, was only entitled to thirty-five per cent on his deposit account on the theory that he would have ultimately collected that much in cash but for his right to a set-off. We allow the full amount of this note, plus accrued interest, or $2007, on the ground that the note was good and collectible by reason of Moxley's indorsement. Two members of the Appellate Court allowed the full amount of the judgment on this note, $2837.34, which was the amount of the note or judgment when collected. The question on the record is as to what was the value of the note on October 21, 1912. The other member of the Appellate Court allowed nothing.

The total amount of the note ($900) of E. F. Rorke collected was $875. The master and two members of the Appellate Court have allowed that sum as the value of this note. The other member of the Appellate Court allowed nothing. We concur in the finding of the master and the Appellate Court to the effect that this entire note and interest were collected, except $25.

We find from the testimony of Kadish and Spohr, which is uncontradicted, that the entire indebtedness ($9866.78) of A. Rosenberg & Sons was paid in full, and that all the collateral paper that was put up by them to secure their notes was entirely paid by the makers of the paper. The fact that some forty days later the debtors became further indebted to the trust and savings bank, some of which debt was not paid, is immaterial to this inquiry. The master allowed a total of $9876.10 on the same theory we have allowed the claim, but made an error of $9.32 in calculating the amount due. Two members of the Appellate Court allowed the sum of $7406.11 upon the theory that the later indebtedness was not paid in full. The other member of the Appellate Court allowed nothing.

The evidence shows that all of the $890.55 note of William Silberman was paid on March 10, 1914, excepting $125, including all interest. His indebtedness was increased, and all of his indebtedness was thereafter paid except $72.70, he having made several payments to the receiver after it came into his hands. Applying the proper proportion of the credits to the old indebtedness and the new, we find he has paid $885 of the old indebtedness and allow that sum as the value of his direct liability. The master allowed the direct liability in full while two members of the Appellate Court only allowed $817.76. Two members of the Appellate Court and the master allowed the indirect liability in full, or $643.70, which was paid in full. The other member of the Appellate Court allowed nothing on either the direct or indirect liability. We also allow in

full the indirect liability, because the evidence shows that it was paid.

On the day the first note of J. Smith & Co. was due, amounting to $99.73, less accrued interest, which was November 6, 1912, the note could have been collected out of their deposit account of $169.25 by charging the note against that account. The Central Trust Company is also entitled to a further allowance of $134.11, being the amount of the total reduction of this claim by proper apportionment of the payments between the old indebtedness to the National Bank and the new indebtedness to the trust and savings bank. We therefore allow $233.84 as the value of this claim. The master allowed the claim in full, or $298.13, and the Appellate Court allowed nothing.

The substance of the evidence is that the eight notes given by the Yavne Institute, less the unearned interest, amounted to $2136.59. The total amount collected on this indebtedness is $1408.02, and the master and two members of the Appellate Court allowed the above sum as the full value of the note. The other member of the Appellate Court allowed nothing. The evidence shows that $716.50 was paid on the notes before they went into the hands of the receiver, leaving a balance due of $1420.09. The receiver compromised the notes with the indorsers for $687.35 in cash, leaving unpaid, including interest not paid, $944.65. The credit of $687.35 would only discharge about $650 of the principal and interest on that amount, and therefore our allowance on this claim is $650 plus $716.50, or $1366.50, as the evidence does not show that any further sum was collectible on this debt.

The aggregate amount of our allowance for all of the claims under this division is $177,917.27.

### Division 13.

There are fifty-three items in this division, numbered from 1 to 53, designated as other bills receivable not in-

cluded in the preceding divisions. The master and two members of the Appellate Court allowed all of these items in full. The other member of the court agreed with the master and the court on twelve of these claims. The other forty-one claims he finds to be worthless. The evidence shows that all of these claims were paid in full, either to the bank or to the receiver. Some of them were paid by others than the original debtors. It is immaterial whether the debt was paid by the debtor's widow after his death, or by his indorser, or by the officer of the bank who made the loan on his personal inclination and paid it because he thought he ought not to have made the loan. We held in the case of *Golden* v. *Cervenka, supra,* that whether or not the capital stock of the National Bank was impaired depended upon the collectibility of the notes and other bills receivable held by the bank. This is an equitable proceeding for the benefit of creditors, and payment in full of bills receivable, with interest, must be regarded as conclusive that they were collectible when made, regardless of the questions when or by whom they were paid. We allow full value on all items, aggregating $195,407.12.

### Division 14.

Under this division the Appellate Court considers and passes on 229 bills receivable, which are designated as all the bills receivable other than those covered in the other divisions of loans and discounts. The Appellate Court makes two subdivisions of this division. In the first subdivision it considers 219 bills receivable, aggregating $695,878.66, from which should be taken the claim of William J. Moxley of $29,825, which was heretofore included and considered under division 3. In the second subdivision there are ten bills receivable, aggregating $209,102.93, making a grand total of $875,156.59 after deducting said claim of $29,825. The master found from the evidence that all the foregoing bills receivable had been credited out or paid

within a short time after October 21, 1912. He further found that they were paid in the ordinary course of business, and that such payment within a short time after October 21, 1912, raised the presumption that they were worth face value and interest on that date, and there being no evidence to rebut such presumption, the master allowed them at their face value, with accrued interest. All members of the Appellate Court concurred in this finding and allowance by the master. The record supports that finding and we have allowed them for the aggregate sum aforesaid. The receiver conceded that "if the entries in the books of the bank are competent evidence as against the creditors, and the fact that these bills receivable are credited out on the bank's books is to be regarded as sufficient proof that they were good on October 21, 1912, then they must be so treated, but otherwise not." We have heretofore held that the books of the bank are competent evidence in this case. It would have been absolutely impossible to have even ascertained the bills receivable of the National Bank without the aid of the books in evidence. There appears to have been no objection before the Appellate Court or the master that the book entries were not made in the due course of business or that the books were incorrectly kept. So far as we have been able to find, there is not a single entry in all the books of the bank that does not show the correct facts as to the entry. It is improbable that the National Bank or the trust and savings bank would give a debtor credit to the extent of his full account if the account were not, in fact, paid, and the creditors and all parties to this record are bound by such entries.

### Division 15.

There was carried on the books of the National Bank an account known as "Funds in transit." The items in this account total $305,247.32. The Appellate Court has considered them under two subdivisions: (*a*) Munday's kites,

amounting to $138,309.14; and (b) transit items other than Munday kites, amounting to $166,938.18. The master and the Appellate Court found that the latter items were paid in full and allowed full value for these items.

As to the transit items other than Munday's kites, aggregating $166,938.18, the books of the bank show that $134,441.76 thereof was paid within one week after October 21, 1912. The remainder of these transit items, aggregating $32,496.42, was shown by the books to have been paid after October 28, 1912, and some of them as late as March and April, 1913, and that they were grain drafts of C. B. Munday & Co. or of the Litchfield Mill and Elevator Company drawn on New Orleans and Richmond banks. The testimony of Kadish and Spohr is to the effect that they represented drafts drawn against cars of grain in transit, and drawn principally on the export points, New Orleans and Richmond. Munday is not charged with these grain drafts in his liability account by the master or by the Appellate Court, apparently for the reason that they were offset by the grain in transit against which the drafts were drawn, and for the same reason we have not included them in the liability account of Munday, as we would have to give him a similar credit on the asset side of his account for an equal amount of grain in transit. The receiver does not question the fact that the grain drafts of Munday and all the other transit items other than Munday's kites were paid in the regular course of business, as shown by the books of the bank. His contention is that the books of the bank are not competent to establish the fact of payment. We concur in the finding of the master and the Appellate Court that the books of the bank are competent evidence to establish *prima facie* that the items were all paid, in accordance with our holding already announced.

The Appellate Court makes the allowance of the items designated as Munday's kites depend upon two questions:

(1) Was Munday solvent on October 21, 1912? and (2) were the items paid? The court makes the finding that the items were not paid. The court also makes the finding that Munday had good assets or resources on said date amounting to $800,295.88, and that his total liabilities were $937,-080.60. The court's conclusion from these facts is that Munday was insolvent and without ability to pay any part of his debt, although his resources under its special finding of facts were more than 92 per cent of his liabilities, as we have already stated under Division 1 of bills receivable. Its final conclusion was that Munday's kites were entirely worthless. The master found that these transit items of Munday were paid in full and that Munday was solvent, and he allowed full value for these items on the ground, simply, that Munday was solvent, and did not find it necessary to discuss the question as to whether or not they were paid. The following tabulation shows the financial standing of C. B. Munday on October 21, 1912, so far as specifically shown by the record:

### RESOURCES

| | |
|---|---|
| 1. Assets of Litchfield Mill and Elevator Company.. | $361,274.33 |
| 2. Cash in bank.................................. | 42,078.16 |
| 3. Kossuth county farm........................... | 28,073.39 |
| 4. 120 shares Marine Bank stock.................. | 18,000.00 |
| 5. 119 shares Bethalto Bank stock................ | 14,280.00 |
| 6. 36 shares Alhambra Bank stock................. | 5,400.00 |
| 7. 79 shares Oconee Bank stock................... | 9,875.00 |
| 8. 2615 shares LaSalle National Bank stock........ | 274,575.00 |
| 9. 200 shares Yukon Gold....................... | 1,400.00 |
| 10. Bonds of Casimer's Congregation.............. | 17,000.00 |
| 11. Huttig and Munday interest in Rosehill cemetery. | 199,033.41 |
| 12. Notes of William Lorimer, Sr................. | 22,000.00 |
| 13. Open account of William Lorimer, Sr.......... | 65,646.32 |
| 14. Farm near Litchfield......................... | 6,240.00 |
| 15. Real estate in Litchfield...................... | 45,000.00 |
| 16. Farm near Zanesville......................... | 3,600.00 |
| 17. Smithboro Bank building and fixtures.......... | 5,000.00 |
| 18. Gassaway mortgage ......................... | 6,000.00 |
| 19. Accounts and bills receivable................. | 100,000.00 |

20. William Lorimer, Sr., notes and mortgage........   30,235.00
21. Interest in Bethalto Lumber Company...........   3,010.50
22. Notes discounted to National Bank by Smithboro
    Bank . ...................................   1,956.47
23. Fred and Bessie Ahlers' note to Smithboro Bank.   2,007.00
24. Notes discounted to National Bank by East Al-
    ton Bank ..................................   1,789.40
      Total . ................................$1,263,473.98

## LIABILITIES

1. Liabilities of Litchfield Mill and Elevator Co.....   $334,321.19
2. Unpaid checks in transit.......................   138,309.14
3. Bank of Smithboro due LaSalle National Bank...   51,474.75
4. Bank of Smithboro due Rosehill Cemetery Co....   20,000.00
5. Bank of Smithboro certificates of deposit held by
    other parties .............................   51,306.25
6. Bank of Smithboro to Topeka Milling Company...   15,000.00
7. Bank of East Alton to Topeka Milling Company..   15,000.00
8. Bank of East Alton to LaSalle National Bank....   16,841.90
9. J. G. Munday to LaSalle National Bank..........   14,049.00
10. J. G. Munday to Bank of Marine...............   2,000.00
11. C. B. Munday & Co. to Colonial T. & S. Bank....   17,000.00
12. C. B. Munday & Co. to Hibernian Banking Ass'n.   8,120.00
13. C. B. Munday & Co. to Mercantile Trust Company   63,500.00
14. C. B. Munday to National Bank of Commerce....   25,000.00
15. C. B. Munday to National Bank of Litchfield.....   4,000.00
16. C. B. Munday to Grant Park Trust and Savings
    Bank . ...................................   20,000.00
17. C. B. Munday and H. W. Huttig to National Life
    Insurance Company ......................   30,000.00
18. J. M. Lavin notes to Bank of Bethalto discounted
    to trust and savings bank...................   5,000.00
19. Pleasant Valley Land Company to National Bank.   10,035.00
20. Bethalto Lumber Company to National Bank.....   3,010.50
21. Smokeless Furnace and Stove Company to Beth-
    alto Bank ................................   2,500.00
22. David Davis note to Bethalto Bank.............   2,500.00
23. Huttig and Munday liability for Rosehill cemetery
    stock . ...................................   199,033.41
24. Jesse Briegel note to National Bank for Texas
    bank stock ...............................   10,035.00
25. William Lorimer, Jr., note to Bethalto Bank......   3,500.00
26. H. W. Huttig note to Bethalto Bank............   4,000.00
      Total . ................................$1,065,536.14
      Net assets to balance.................   $197,937.84

As heretofore stated, both parties to this suit concede that the assets and liabilities of the Litchfield Mill and Elevator Company are also properly listed as the assets and liabilities of Munday.   Under Division I of bills receivable we have already discussed and settled the amount of assets and liabilities of the Litchfield Mill and Elevator Company and the various items composing the same, and it will not be necessary at this time to further consider them.   The first items of the account of Munday above given are simply the total assets and liabilities of the Litchfield Mill and Elevator Company.   Among the liabilities of the latter company are included the liabilities of John K. Seagrave and J. K. Seagrave & Co. to the National Bank, aggregating $40,611.66.   The Appellate Court has again charged the above debts as liabilities against Munday, thereby doubling Munday's liability as to these items.

Both the master and the Appellate Court concurred in their valuation of items 2, 3, 4, 5, 6, 7, 9, 10, 14 and 16 of the items above listed as Munday's assets and in the amounts above stated.   The evidence certainly justified their conclusion as to those items, and if we were disposed to make any change at all in the amounts of those items our inclination would be to change their valuations on items 14 and 16.   The evidence really warrants a higher value on the two pieces of real estate known as farm near Litchfield and farm near Zanesville, but we are content with letting them remain as above given, as the change would make no material difference in the result of this accounting.   As to item 8 of the assets, 2615 shares of LaSalle National Bank stock, we have concurred with the Appellate Court in valuing it at $105 per share, for the reason that the evidence in the record is that the market value of this bank stock in October, 1912, was from $105 to $110 per share, and wherever we have had occasion heretofore in this case to value this bank stock we have valued it as aforesaid. The master valued this stock at $117.08 per share.   As a

matter of fact, these shares were worth $117.69 per share, according to our valuations of the assets and liabilities of the National Bank on October 21, 1912.

In our consideration of the bills receivable against the Cemetery Securities Company we have already held that Huttig and Munday and the other members of the syndicate were liable for all the money borrowed by the Cemetery Securities Company, and that as Munday and Huttig were the first to be paid the money so borrowed to pay for the shares of the Rosehill cemetery purchased by the syndicate, their interests in the Rosehill cemetery were worth all the money they invested in that stock on and before October 21, 1912, whether borrowed by themselves individually or in the name of the Cemetery Securities Company. The total sum so invested amounted to $199,033.41, $100,000 of which was furnished by Munday, $59,585.51 by Huttig, and $24,447.90 thereof was borrowed in the name of the Cemetery Securities Company from the National Bank and $15,000 thereof from the Farmer's Bank of Bethalto. The latter bank has been paid in full for the money borrowed of it by the Cemetery Securities Company, and the National Bank, as we have already held, has been paid in full for the money borrowed of it except the sum of $2813.07, for which we have held Munday liable individually, as indorser and as member of the syndicate. Munday and Huttig's liability by reason of the money thus furnished to pay for the Rosehill cemetery stock we therefore find to be offset by a like sum as assets or resources. We therefore have charged to Munday's liability account to Huttig and Munday the sum of $199,033.41 and have given credit in Munday's resources of a like sum to Munday and Huttig. Munday in reality received all the money back that he paid out for the Rosehill cemetery stock when he assigned the note of $100,000 given him by the Cemetery Securities Company to the National Bank. Huttig received a note from the Cemetery Securities Company for

the amount he so paid out, but so far as the record shows he did not discount that note in violation of his agreement not to do so. Munday and Huttig jointly agreed with the syndicate to furnish the money necessary to apply on their contract of purchase which would not be supplied by the syndicate's part of the dividends of the cemetery. We therefore treat their agreement as a joint liability. It has been a difficult matter to determine exactly from the record the exact amount that Munday and Huttig borrowed prior to October 21, 1912, to apply on the Lansingh and other contracts for the Rosehill cemetery stock purchased by the syndicate, but it is immaterial so far as this accounting is concerned, as Munday and Huttig are entitled to an equal amount in this accounting as assets and liabilities, as we have held that their stock in the Rosehill cemetery, or interest therein, was worth as much as they had applied on the contracts.

In items 12 and 13 of the asset side of Munday's account we have given him credit for the notes of William Lorimer, Sr., owed personally to Munday, amounting to $22,000, and also the open account of Lorimer, amounting to the sum of $65,646.32, owed personally to Munday, for the reason that these two items are charged to Lorimer on the liability side of his account, as already shown in our discussion of Lorimer's indebtedness. We found Lorimer solvent, and these must therefore be regarded as good assets of Munday.

The only testimony in the record as to the value of Munday's real estate in Litchfield that was definite and certain was that of Munday himself, who testified that it was worth from $45,000 to $50,000. The only value given to this property by the Appellate Court was $15,000, which was the value that Munday placed on his and his son's home, and the court gave no heed to his testimony as to the value of his other real estate in Litchfield, which he included with the home of himself and his son and valued

it all as aforesaid. The master took the average of Munday's two valuations and gave him credit for $47,500 for this item as an asset. We know of no rule by which we can ignore the positive testimony in the record and allow less than $45,000 for this item, No. 15.

In accordance with the evidence in the record we have also agreed with the master that the bank building and fixtures of the Bank of Smithboro were of the value of $5000, and have allowed that sum for item 17 of Munday's assets. The record also discloses that Munday was the owner of item 18, known as the Gassaway mortgage, for $6000, and that it was worth full face value and that he is entitled to a credit for that amount. Munday positively testified that there was owing to him personally by parties living in and near Litchfield, good accounts amounting to from $50,000 to $75,000, and that he likewise owned good notes owed by parties in and near Litchfield amounting to the further sum of from $50,000 to $75,000. This testimony is not contradicted in the record and Munday's testimony was the only evidence on these items. The master allowed the lowest amount testified to by Munday for each of these items, and we have done likewise, and have allowed him the sum of $100,000 as item 19, designated as "Accounts and bills receivable." The Appellate Court disregarded his testimony entirely and did not allow anything on this item, apparently for the reason that he could not itemize the accounts or the notes. Munday's testimony was to the effect that all of his books of account, including these items, and also his bank books of the Bank of Smithboro and the Bank of East. Alton, and the books of the Litchfield Mill and Elevator Company, were either in the hands of the State of Illinois or the government, who were prosecuting him for certain alleged crimes, and that it was not possible for him to consult his books, and consequently not possible for him to itemize very many of his individual assets or his assets in any of the above concerns. The re-

ceiver, and also the Central Trust Company, make similar statements that it was not possible to introduce or use the books in evidence in this case. The receiver seems to have had no trouble in making proof of all of the liabilities of Munday individually, as well as those contracted in the name of the Bank of Smithboro, the Bank of East Alton, the Litchfield Mill and Elevator Company and the Litchfield Drug Company, and all other concerns with which Munday was connected. It very positively appears from the record evidence that the concern known as the Litchfield Drug Company was owned and controlled by Munday and managed by John K. Seagrave and others. We concur with the master that the testimony of Munday cannot be disregarded, and we have therefore allowed $100,000 on this item as good assets.

Items 20, 21, 22, 23 and 24 of the asset side of Munday's account as above given by us, include additional assets of Munday for which no credit was given by either the master or the Appellate Court. Item 20 amounts to $30,235, and is credited to him for the notes and mortgage given by Lorimer to Munday on his Michigan farm of 670 acres. We have already given our reasons for allowing this sum as an asset of Munday in our discussion of Lorimer's indebtedness, and we do not deem it necessary to further discuss this item except to say there is absolutely no reason found in the record or in the receiver's argument why these assets should not be considered good assets in the above sum, as they were absolutely good security and were given to Munday prior to October 21, 1912, and held by him until October 23, 1912, when he discounted them to the trust and savings bank and received credit for the same. There is no evidence in the record as to the value of Munday's interest in the Bethalto Lumber Company, which was a partnership composed of himself and son and E. H. Starkey, except that H. H. Starkey merely testified that he thought his brother's equity was worth $500, and that the

company only owed one debt of $3010.50 to the National Bank, and that there was stock at all times in the yard of this company amply sufficient to pay this debt. We therefore allow this debt to the National Bank in full because of the fact that it was a partnership and that the debt was a good debt, for which Munday was also liable. We have therefore allowed as item 21 the above amount, which is equal to the debt as an asset of Munday. The evidence would warrant us in allowing $500 more for this asset in this accounting, as Munday's interest or equity was worth as much as Starkey's. Items 22, 23 and 24 are simply allowances for good and collectible bills receivable of the banks of Smithboro and East Alton discounted to the National Bank, and which have heretofore been explained in our consideration of the bills receivable of the Bank of Smithboro and the Bank of East Alton owed to the National Bank. These are the only bills receivable that were discounted by the Bank of Smithboro and the Bank of East Alton on or before October 21, 1912, so far as this record shows, and as these banks have been charged with the amount of these notes as an indirect liability to the National Bank and also to Munday in this accounting, there can be no question as to the right of Munday to have the amount of these items credited to him as assets, and we have accordingly given him credit, as the original debtors on these discounted notes paid them in full to the National Bank.

Both the Central Trust Company and the receiver agree that Munday is properly charged with items 2, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15 and 17 as above given in our list of his liabilities and in the amounts specified. Both the master and Appellate Court have also included those items in the above amounts as liabilities of Munday. Both the master and the Appellate Court have listed the liability of the Bank of Smithboro to the National Bank as a liability of Munday, and it is not questioned by either party to this proceeding that such liability is a liability of Munday. We

have also listed this liability as item 3 of the liabilities of Munday but have fixed the amount at $51,474.75, which is the correct amount as found by both the master and the Appellate Court in their discussion of the liability of the Bank of Smithboro to the National Bank and of Lorimer to the National Bank. In this liability are included the six certificates of deposit that Munday gave to Lorimer as a loan on Lorimer's Michigan farm. Both the master and the Appellate Court charged three of these certificates of deposit to Lorimer as his liability and the other three to the Bank of Smithboro. As heretofore stated in our consideration of the indebtedness of the Bank of Smithboro and of Lorimer to the National Bank, we charged the same as a liability of the Bank of Smithboro and refused to charge any part thereof to Lorimer as a direct liability, and have now charged all as a liability of Munday. Three of these certificates of deposit charged to the Bank of Smithboro on October 21, 1912, less unearned interest, amounted to $14,-187.51. The other three certificates of deposit charged to Lorimer amounted to $15,012.51, including accrued interest. The indebtedness of the Bank of Smithboro to the National Bank also included certificates of deposit Nos. 6857 and 7657, amounting on October 21, 1912, to $5108.34 and $10,125, respectively. It also included the note of Fred and Bessie Ahlers of $2007, including accrued interest, and an indirect liability of $5034.39, which totals $51,474.75, as we have given it above. The indirect liability above stated of $5034.39 included eleven notes discounted by the Bank of Smithboro to the National Bank and a certificate of deposit on the Bank of Smithboro, as we have already stated in our discussion of the indebtedness of that bank.

Both the master and the Appellate Court have listed the liabilities of the Bank of East Alton to the National Bank and the liability of J. G. Munday to the National Bank as liabilities of Munday, and there is no question by either party to the record that this was properly done, but we

find that the master and Appellate Court listed these amounts as $16,804.79 and $14,000, respectively. We have fixed the amount of these liabilities as $16,841.90 and $14,049, respectively, in our items 8 and 9 of Munday's liabilities. Both the master and the Appellate Court failed to include in their amounts the accrued interest on these items up to October 21, 1912. Both the master and Appellate Court have also included the indebtedness of C. B. Munday & Co. to the Grant Park Trust and Savings Bank, amounting to $20,000, as a liability of Munday. We have charged the same as a liability of Munday as item 16. The master offset this amount by giving Munday a credit on the asset side of his account for $20,000 for that amount of certificates of deposit held by him and issued by the Grant Park Trust and Savings Bank. The Appellate Court refused to allow this amount as set-off against Munday's liabilities. We think the record sustains the court in doing so. The record does show that Munday owned these certificates of deposit in the above amount before October 21, 1912. The record also shows that he disposed of them, but we cannot ascertain definitely whether he disposed of them before October 21, 1912. To entitle him to such credit the proof should have shown that he was the holder thereof on October 21, 1912.

The receiver contends that Munday should be charged with Lorimer's note to William J. Moxley for $90,000, to secure which Lorimer gave Moxley 900 shares of stock in the National Bank. We have already charged this liability to Lorimer, and there is no reason whatever shown by the record for considering this as Munday's liability, so far as we have been able to find. We agree with the Appellate Court and master in holding that the evidence does not sustain the receiver in this contention. We make the same finding as to Moxley's note of $25,000 to the National Bank and which we have allowed against Moxley in Division 3 of bills receivable. Moxley's testimony and the other testi-

mony in the record makes it clear that it was his own individual liability and that he was worth over a million dollars over and above his debts. The master refused to allow this as a liability of Munday but the Appellate Court has included it as a Munday liability.

The receiver insists that Munday was liable on certain notes held by the Marine, Bethalto, Oconee and Alhambra banks which had been discounted by those banks at his request and with the agreement that he would see them paid, which agreement is evidenced by certain letters written by Munday to those banks. The aggregate amount of those notes as stated by the receiver was $87,475, but as a matter of fact they aggregated, as listed by him, $85,425. He, however, omitted from this list two notes of John M. Lavin, amounting to $5000, making the total aggregate as found by us to be $90,425. A complete list of these debtors is found in the abstract, at pages 3445-46. The receiver bases its contention that these are liabilities of Munday on the grounds (1) that Munday agreed to see them paid; (2) that these claims or notes would not have been collectible had the National Bank suspended. The National Bank did not suspend business until it was denationalized, and Munday's liability could only be established upon other grounds. The receiver concedes that the notes of J. E. Hillskotter and Charles G. Fox, aggregating $6500, were good and collectible notes, and it does not contend that these notes were chargeable to Munday. This cuts down the aggregate of the notes to $83,925. The record evidence found at pages 3445-46 of the abstract shows that the remainder of this list of notes was paid except the notes of the following named parties in the following amounts: William Lorimer, Sr., to the Bethalto Bank, $3500; William Lorimer, Jr., to the Bethalto Bank, $3500; Litchfield Mill and Elevator Company to the Bethalto Bank, $3500; Litchfield Mill and Elevator Company to the Alhambra Bank, $3500; Seagrave-Katz Grain Company to Alhambra

Bank, $2500; David Davis to the Bethalto Bank, $2500; H. W. Huttig to the Bethalto Bank, $4000; Cemetery Securities Company to the Bethalto Bank, $5000; Smokeless Furnace and Stove Company to the Bethalto Bank, $2500; and John M. Lavin to the Bethalto Bank, $5000,—all of which aggregate $35,500.

Of the $35,500 list of notes above given, the two notes of the Litchfield Mill and Elevator Company to the Alhambra Bank and Bethalto Bank have already been charged to the Litchfield Mill and Elevator Company and are included in the total liabilities of that company as item 1 of Munday's liabilities as above given by us. The $3500 note of William Lorimer to the Bethalto Bank was a good and collectible note as Lorimer was solvent, and this note is evidently included among the liabilities of Lorimer under the designation of "Other indebtedness, general, $18,000," or in his indebtedness to Munday. If this note is not included in that list of liabilities it must be considered as paid, because it was not among the list of the unpaid notes of the above class to the Bank of Bethalto as shown by the testimony of H. H. Starkey at page 3799 of the abstract, where he gives a complete list of the paper held by the Bank of Bethalto that was unpaid when the trust and savings bank closed, in June, 1914. The evidence in this record discloses the fact that the books of the Bank of Bethalto could not be had or used in evidence in this case because in the hands of the State or government or parties other than the parties who controlled that bank. The notes of William Lorimer, Jr., Seagrave-Katz Grain Company, David Davis, H. W. Huttig, John M. Lavin, Cemetery Securities Company and Smokeless Furnace and Stove Company were not on the list of the notes furnished by Starkey as the unpaid notes of the Bethalto Bank in the above class.

The record shows that the Seagrave-Katz Grain Company note of $2500 was paid, as shown by the testimony of John K. Seagrave, who testified that the affairs of that

company were completely wound up and all of its debts fully paid. It also shows the note of $5000 of the Cemetery Securities Company was paid by it on the day the note was due, March 25, 1913. The two notes of John M. Lavin, for $2500 each, were sold or transferred to the trust and savings bank on March 10, 1913, and remained in that bank until it closed. This $5000 debt of Lavin was made by him for stock of the National Bank, which Munday kept or sold and failed to credit Lavin with on his note, as shown by the testimony of Kadish and Spohr. These notes are clearly liabilities of Munday, and we have so charged them as item 18 of the liability side of his account. We also find that the note of the Smokeless Furnace and Stove Company for $2500 in the Bethalto Bank is a liability of Munday. This company was a corporation, in which Munday, Hughes and Green were stockholders and organizers. There is no evidence in the record of payment by the company itself or that the company was solvent. The testimony is rather to the effect that it was an insolvent company, and that this note was probably paid by Munday to the Bethalto Bank or another note exchanged for it. We therefore charge it as a liability of Munday as item 21 of his liabilities.

As to the notes of David Davis for $2500, of William Lorimer, Jr., for $3500, and of H. W. Huttig for $4000, to the Bethalto Bank, aggregating $10,000, the record does not furnish any satisfactory showing. It is certain that these notes were either paid to the Bethalto Bank or that Munday exchanged other notes for them. We may have overlooked the evidence, if it is found in the record, as to the Lorimer and Huttig notes. William Lorimer, Jr., is shown to have paid all other of the indebtedness that he owed personally on or before October 21, 1912. The evidence does conclusively show that Munday considered himself personally liable for $20,000 or more of Davis' indebtedness. The record shows, as the master has said in

his treatment of the indebtedness of Jesse Briegel, that on September 23, 1913, the Commercial Bond and Investment Company gave its five notes, which, including accrued interest, aggregated $41,089.68. With the proceeds of these two notes of Davis, Nos. 8018 and 8206, for $10,000 each, Briegel's note No. 7476, for $10,035, and a certificate of deposit of the Grant Park Trust and Savings Bank, were paid and credited out, and the balance of the proceeds of $4000 was credited to C. B. Munday & Co. The Commercial Bond and Investment Company, as we have previously stated, was a corporation organized by Huttig, Munday and Briegel. Munday held for Davis, according to Davis' testimony, a number of bonds which he sold or disposed of, and Davis was unable to state whether or not Munday had accounted to him for those bonds or applied them on his indebtedness. The record evidence indicates that Munday probably applied the proceeds of those bonds to his own use and at the same time sought to eliminate Davis' notes to the bank in the foregoing manner. The Commercial Bond and Investment Company we have held insolvent and that its note aforesaid did not constitute payment of Davis' and Briegel's indebtedness. The record does not show that Munday became liable to Davis for the above $20,000 before October 21, 1912. If it did, we would charge the $20,000 notes of Davis to him which we have allowed in the name of Davis. However, if we were to charge the two Davis notes for $20,000 and the Davis note for $2500, and also the notes of Huttig and William Lorimer, Jr., it could make no difference in the result of our accounting, as Munday would still be found to be solvent. There is no doubt that there was a liability of Munday to the Bethalto Bank on the notes of William Lorimer, Jr., and of Huttig, and for the $2500 note of Davis. The record is entirely wanting in proof to the effect that Munday was under obligation to Lorimer or to Huttig to pay their notes, and that his only liability thereon was to the Beth-

alto Bank to see that they were paid. The record evidence does not show what became of these notes after they left the Bethalto Bank. On the whole of the evidence we have concluded to charge the $2500 note of Davis, the $3500 note of Lorimer, Jr., and the $4000 note of Huttig, to Munday as liabilities, and we have done so in items 22, 25 and 26 of Munday's liabilities. In all our consideration of this class of notes we have only considered Munday liable on them by reason of his agreement to "see them paid," unless there is some other evidence in the record showing other grounds for his liability. When a note is shown by the record evidence to be paid that is in this class but it does not appear who paid the same, we indulge in the presumption that it was paid by the parties primarily liable thereon.

As we have previously stated, the notes of the class last discussed owed to the banks of Alhambra, Marine and Oconee were shown to have been paid, and none of these notes are chargeable to Munday as liabilities except such of those notes as have already been so charged to Munday.

We have charged the note of Jesse Briegel to the National Bank for Texas bank stock, amounting to $10,035, to Munday in item 24 of his liabilities, because of the fact that Briegel borrowed this money of the National Bank to pay for the Texas bank stock, which Munday kept or sold and applied the proceeds to his own credit and recognized this debt of Briegel as his personal debt, as already stated. It is very probable that Munday should also be credited with a like amount as assets for the Texas bank stock purchased for Briegel, but we have not added this item to his assets because we have not been able to find from the record that Munday was the owner of this stock on October 21, 1912, and for the further reason that whether he disposed of the stock before that time is not material to this accounting, as he is abundantly solvent after omitting this item as an asset.

We have allowed as a liability against Munday the note of the Pleasant Valley Land Company for $10,035 as item 19 of Munday's liabilities for the reasons heretofore stated in our consideration of item 13 of Division 3 of bills receivable.

It will be observed that in our casting of the account of Munday most all of the questions as to the propriety of giving him credit for assets have been settled against the Central Trust Company, and the same is true as to the propriety of charging him with liabilities. We feel morally certain from the indications in the record that our finding that Munday's assets exceeded his liabilities by $197,-937.84 is very conservative, and that had the Central Trust Company had the benefit of all of the evidence it was entitled to, Munday's assets would have been many thousands of dollars more in excess of his liabilities than the amount found by us. The record shows that Munday had a great many assets on October 21, 1912, that have not been valued and concerning which there is no positive evidence in the record. In confirmation of this statement we call attention to the fact that the record evidence clearly discloses that Munday was the owner of the Litchfield Drug Company, in Litchfield, and there is no proof in the record as to the value of the assets of this company on October 21, 1912. This company owed no debts that are not shown to have been paid. In his bankruptcy schedule, filed after the trust and savings bank closed, Munday listed his stock in the Litchfield Drug Company at $5000. This company, a corporation, was in existence on October 21, 1912, but as to the value of his stock on that date the record furnished no evidence, so far as we have been able to find.

The Bank of Smithboro and the Bank of East Alton were private down-State banks of Munday. The record indicates that they were very prosperous banks and transacted a considerable volume of business on and prior to October 21, 1912. It is hardly conceivable that these two

banks did not have good bills receivable and other good assets other than is shown by the record. The master and the Appellate Court, as already shown, gave neither of these two banks any credit whatever for bills receivable or for any assets except cash in banks and the bank building and fixtures of the Bank of Smithboro. We have not been able to discover the fact that they owned bills receivable of any character except in two instances where they discounted good bills receivable to the LaSalle National Bank and for which we have given credit. These were for only small amounts. Munday scheduled in his bankruptcy schedule as assets, loans and discounts of these two banks the sum of $223,902.50, but what these loans and discounts amounted to on October 21, 1912, it is not possible for us to determine as there is no evidence bearing on those questions. Munday also scheduled in his bankruptcy schedule as assets, furniture and fixtures of the Peoples Bank of East Alton and valued them at $2055, and also overdrafts of these two banks amounting to $7844.69. It does not even appear in the record that this bank had furniture and fixtures on October 21, 1912, but it is inconceivable that it was conducting a banking business in the name of the Bank of East Alton without furniture and fixtures. It is also probable that it had overdrafts in some amount. Munday also scheduled the following property in his bankruptcy schedules: Two life insurance policies on his own life for $50,000 each, six other life insurance policies of an aggregate surrender value of $3357, and household furniture and wearing apparel of the value of $400. He is credited in this accounting with no property of the character just specified. He also scheduled stock of the value of $26,607.52, and wagons and horses, etc., at Litchfield of the value of $2152.88, and trade-marks of the value of $11,500. It is possible that the stock, horses and wagons just mentioned were a part of the physical assets of the Litchfield Mill and Elevator Company, and that the

trade-marks also pertained to the business of that company. There is no evidence that he owned private vehicles, stock on farms, and many other articles of personal property that a man of Munday's wealth usually owns, other than above shown, either on October 21, 1912, or June 12, 1914. Munday in his testimony stated that he was worth between $500,000 and $600,000 in May, 1910, and that he had about the same property in October, 1912, (not including his stock in the Rosehill cemetery,) which consisted largely of bank stocks, which he thought had increased in market value to some extent during the period of two years. He estimated his Rosehill cemetery stock as between $500,000 and $600,-000 on October 21, 1912, and including this stock he estimated his net worth at between $1,000,000 and $1,100,000. There is abundance of evidence in the record, as heretofore stated, that would indicate that Munday's assets exceeded his liabilities by at least $500,000 in October, 1912, and that this fact would have been specifically shown in the record if all his assets had been accounted for and valued that the record indicates he had. We have made this concluding statement simply for the purpose of a further indication that we cannot be mistaken in our repeated holdings that Munday was abundantly solvent and well able to pay all of his indebtedness on October 21, 1912, and that the argument made in this case to the contrary is not sustainable under any theory when we confine ourselves to the actual evidence.

A great deal has been said by the receiver concerning the personal honesty and integrity of Munday, William Lorimer, Sr., and H. W. Huttig, their associates in the Cemetery Securities Company, and their transactions in that company and in connection with the National Bank and trust and savings bank, and the weight that should be given to the testimony of all the parties who testified in this case. Huttig was one of the parties indicted for some of the transactions in connection with the trust and sav-

ings bank. He never gave any testimony in this case and was purposely absent from the State by reason of this indictment. Munday at first refused to testify in this case by reason of the fact that he was indicted and that he might be called on to give testimony that would tend to incriminate him. Finally, under the advice of his attorney, he appeared and testified. There appears no reason whatever why he should have considered that he had any personal interest in this case, and the same is true when we come to consider the testimony of Lorimer. They have given no evidence in this case material to the issues that could not have been refuted by the testimony of other witnesses if it were untrue, except possibly some of Munday's testimony concerning the amount in value of his assets over his liabilities in May, 1910, and October, 1912, and such testimony has not influenced in the least the value we have given his assets, except where the receiver had abundant opportunity to show that his evidence was untrue and failed to do so. We should possibly make one exception to this latter statement as to the item of his assets designated as "accounts and bills receivable" owed to him personally, and if this item were entirely stricken from the asset side of his account he would still be abundantly solvent. We therefore see no occasion for discussing or considering the honesty or integrity of these two witnesses in the transactions with the trust and savings bank, which have little or nothing to do with the result of this lawsuit, or even their transactions with the National Bank, many of which have been characterized as acts that should be condemned by good bankers and which have been characterized by the receiver as acts of dishonesty. Lorimer knew very little about the transactions with the National Bank, and his testimony very clearly so shows and his personal dealings with the National Bank speak for themselves. A number of Munday's transactions with the National Bank and with the trust and savings bank are justly the subject of criticism, but none

of them justify us, after a consideration of all the facts in the record, in disregarding the plain and simple evidence in the record, which shows that Lorimer, Munday and Huttig were solvent on October 21, 1912, and good for all the debts they owed, and that the assets of the National Bank were only impaired to the extent that we have found. We may say in conclusion on this latter question, that the rec-- ord shows by the market value of the stock of the National Bank and by common repute that no one regarded the National Bank as insolvent who had to any extent made an investigation of its records. This is shown clearly by the evidence of the bank examiners and even the examiner for the clearing house, who investigated its financial condition and the conduct of its officers in some particular transactions which were the subject of his criticisms.

### Bank Building Account.

There was carried on the books of the National Bank on October 21, 1912, as an asset, an account designated as "Account of new bank building, $25,000." The master valued this item at $75,000. The Appellate Court allowed $25,000 for the same, and we have allowed $50,000.

In September, 1912, the National Bank entered into a contract with the Farwell estate, through William Lorimer, Sr., and a broker, for the purchase of the real estate and building in question, situated at the corner of Quincy and LaSalle streets, in Chicago, for the sum of $500,000,— $25,000 of which was paid in cash at the time of the execution of the contract, $275,000 was to be paid in cash when the title was accepted, and the bank was to assume an incumbrance of $200,000 which was then upon the property. This property came into the possession of the trust and savings bank as an asset, with the liability accompanying it. After improvements and alterations were made on the building the trust and savings bank moved into it and was occupying it at the time of the appointment of the receiver. The property came into the hands of the receiver,

who sold it in the early part of 1916 for $406,500, or $93,-
500 less than the purchase price. The negotiations for the
purchase of this property were begun by Lorimer in August,
1912. The testimony shows that the market value of this
property in 1916 was not as much as it was in October,
1912, and that similar property in that vicinity had been
increasing in value up to October, 1912. According to the
testimony of the experts and of Lorimer, similar property
in that vicinity had become greatly depreciated in value dur-
ing the year 1914 and had not reached the high values of
1912 at the time the bank property was sold. Lorimer
testified that he made investigations as to the value of the
real estate at the time he made the contract, and that in
his judgment the contract was worth $125,000, and that
the property was worth at least that much more than what
they gave for it on October 21, 1912. He further testified
that Lorenzo E. Anderson, of St. Louis, made an offer to
the bank of $600,000 for the property and that his offer
was not accepted. Expert Albert Strauss testified that it
was worth at least $550,000 in October, 1912, and that he
was very sure he could have sold it for that amount of
money. Expert Levy testified that in his judgment the fair
market value of the property on October 21, 1912, was
$635,000, or $250 per square foot. Expert Pace testified
that the fair market value of the property on said date
was $600,000. There is no other evidence as to the value
of this property except the fact it was purchased for $500,-
000 and was carried on the books of the bank at $25,000,
the amount of the payment made on the contract and the
only payment that was made by the National Bank. The
master's valuation of $75,000 was made by rating the prop-
erty at the value of $550,000, the lowest value placed on
this property by any of the four witnesses who testified.
The Appellate Court considered the contract price for it
in September, 1912, as the best evidence of its value on
October 21, 1912. There is some evidence in the record

that the Farwell estate was forced by certain pressing conditions to make a sale of the property at the time it did. The evidence does not show what efforts were made by that estate to get the best price obtainable for the property. We think, however, that some consideration should be given to the fact that it was contracted for by the bank at $500,-000 only a short time before October 21, 1912. Giving equal consideration to the judgment of the Appellate Court and that of the master, we have fixed the value of this item at $50,000, which is in substance a finding that it was worth to the National Bank on October 21, 1912, $25,000, the total amount paid on the contract by it, and in addition thereto $25,000, which makes a valuation of the realty on October 21, 1912, of $525,000.

### Good Will.

The Central Trust Company contends in this case that it is entitled in the accounting as one of its assets and as an asset of the National Bank, to the sum of $68,838.17, the same being the proved value of the good will of the bank, and which became the property of the trust and savings bank on October 22, 1912. The receiver, on the other hand, contends that nothing should be allowed for good will as an asset of the National Bank. Two members of the Appellate Court and the master allowed nothing for this item. The third member of the Appellate Court allowed full value for this item as claimed by the Central Trust Company, or $68,838.17. We agree with this member of the Appellate Court that the Central Trust Company is entitled to a credit of whatever the evidence shows the good will was worth, but we find from the evidence that that valuation should be placed at the sum of $65,000.

Good will was defined by Lord Elden in *Cruttwell* v. *Lye,* 17 Ves. 365, as "the probability that the old customers will resort to the old place." In *Wedderburn,* 22 Beav. 84, the court said that good will "is an appreciable part of

312—33

the assets of a concern, both in fact and in the estimation
of a court of equity." It has long been established in busi-
ness circles and by the decisions of the courts of England
and of this country that good will is property. This court
in a number of cases has held the same, and that in the
valuation of business concerns the valuation is not com-
plete unless something has been added for good will, where
such business concerns have continued for a sufficient length
of time to have acquired a profitable and substantial list of
patrons whose patronage is necessary to the success of the
business and whose patronage has been secured by the ef-
forts of those who run the business and by a line of con-
duct that continues such patrons in the transaction of busi-
ness with the concerns. In the case of *Lindemann* v. *Rusk,*
125 Wis. 210, it was held that a banking corporation may
have a good will constituting a species of property, and
that when it is liquidated or wound up the good will may
be transferred to another. The testimony in this case is
to the effect that the measure of the good will of a bank is
determined by the amount of its deposits in case the bank is
solvent or is generally regarded as solvent, and that in Chi-
cago the custom is to pay five per cent on the individual
deposits of a bank, less the deposits known as public funds,
for good will. The total individual and savings deposits,
other than certificates of deposit, of the National Bank on
October 21, 1912, were $1,962,873, and after deducting the
deposits of public funds the remaining deposits amounted
to $1,376,763.55, and the good will of the National Bank
at five per cent of the amount of such deposits would equal
the sum contended for by the Central Trust Company and
allowed by one member of the Appellate Court. The Na-
tional Bank had the ability to pay all of its debts to the
real creditors and to pay its stockholders more than $117
per share for their stock, and the evidence does not warrant
the conclusion that there was a suspicion among good busi-
ness men in Chicago or patrons of the National Bank, or

of men acquainted with its condition, to consider it insolvent. There is no reason, therefore, for not allowing good will as an asset of the National Bank.

In making this allowance for good will of the National Bank we have taken into consideration the fact that $40,840.74 of its deposits only averages $41.33 for every depositor depositing said sum, and that $25,399.95 was deposited by depositors whose average deposit was $239.62. We have also taken into account the further fact that there were a number of other depositors who owed the National Bank and who were insolvent, and although their deposits amounted to more than $200, their deposit account could not be considered of very much value, if any, to a bank. Our conclusion is that of said deposits other than public accounts, and certificates of deposit amounting to $1,376,763.55, only $1,300,000 thereof should be regarded as substantial and paying accounts to the bank and worth five per cent to a bank taking them over for the purpose of continuing banking business at the same place of business. We have therefore only allowed $65,000 for good will.

Two members of the Appellate Court and the master base their refusal for allowing anything for good will upon their assumption that the trust and savings bank and the National Bank did not constitute two separate and distinct institutions, and that the denationalizing of the National Bank and the taking over of its assets by the trust and savings bank were, in effect, merely the changing of the corporate name of the bank and that there was no change in the personnel. The trust and savings bank was the immediate successor of the National Bank and got all of the benefit of the good will that was owned by the National Bank as an asset. Good will as an asset was just as certainly assigned and transferred to the trust and savings bank as it would have been if another bank in Chicago had purchased all of the assets of the National Bank on a voluntary dissolution and had continued business in the same

place. The purpose of this accounting is, in fact, the valuing of the assets of the National Bank and the ascertainment of the impairment thereof, as already stated, and there is no intimation whatever in our former opinion that would give any ground for the conclusion that good will in this accounting is not to be considered as an asset. The other ground given by the Appellate Court for not allowing this claim is that the evidence in the record shows that the deposit should remain in the bank for a certain time, which time was not stated, before it could realize five per cent for the good will, and is not supported by the evidence, as only one witness who testified on this subject gave any such intimation.

There were carried on the books of the National Bank as resources of the bank the ten notes given by the ten stockholders of the National Bank for the reasons and purposes stated in the former case of *Golden* v. *Cervenka, supra.* There was an equal amount carried as a liability of the bank on October 21, 1912, as the liability was considered discharged, as stated in the former case. The Central Trust Company contends that these notes were not discharged by payment and that they were liabilities of the stockholders, and that they could not evade such liability in the manner they sought to do. It is not material to decide that question in this case, and it is not our intention to decide it so far as the creditors are concerned who are prosecuting this suit through the receiver against the Central Trust Company. We do very decidedly hold, however, that there is no liability of the stockholders on the ten notes to the Central Trust Company in this accounting. On the evidence in the case there is no theory upon which there could be such a liability, as this proceeding is simply a proceeding to determine the liability of the Central Trust Company to the creditors. The contention of the receiver is that the showing in the record is to the effect that the trust and savings bank is insolvent to the extent that the liability of the

Central Trust Company and of the stockholders of the trust and savings bank will not be sufficient to pay the creditors, and that contention is apparently sustained by the record evidence when we consider such liability as of June 12, 1914. Therefore there is no reason to pursue this inquiry further, as there is no possibility that such creditors will finally receive full satisfaction on their claims against the trust and savings bank, as is *prima facie* shown by the record evidence, but we are not to be understood as holding that such creditors would not have received full satisfaction if all the assets of the National Bank had been properly handled by the receiver and disposed of at full value. Under no theory of the case can there be a liability of the stockholders to the Central Trust Company in this case, and on the other hand there is no theory upon which there can be a liability of the Central Trust Company to such stockholders; and this is our holding and our reason for disallowing the claim that the notes are resources of the Central Trust Company in this accounting.

This case has now been twice reviewed by this court. The cause has been twice tried before the circuit court at enormous cost to the parties. The Appellate Court and the circuit court found that the taxable costs of the receiver in this case in the circuit court were $16,203.52 and that the taxable costs of the Central Trust Company in that court were $15,957.12, and there is no dispute on that proposition. This shows that this litigation ought to end, if it can equitably be ended and without violating any positive rules of law, by our decision in this case. For this very reason we have made an allowance of attorneys' fees to the receiver for the collection of two of the bills receivable, namely, the indebtedness of the Topeka Milling Company and of Neely & Peacock to the National Bank, which claims we have found can positively be collected in full by the receiver, and have also substantially made the finding that those claims cannot be collected by the receiver with-

out the expense of attorney's fees which have already been incurred by him as to the claim of the Topeka Milling Company. It is unusual for this court to make such an order as to attorneys' fees where there is absolutely no evidence in the record as to what would be such reasonable fees, but the amount of the remainder of those debts is certain and the character of the litigation that will be necessary to finally collect these debts clearly appears from the record, and the only element wanting in properly assessing those fees is the amount of work to be done by the attorneys. Any further litigation concerning these fees or concerning this case would cause much more expense to both parties and more attorneys' fees than any possible difference which might be finally found to be proper legal and reasonable attorneys' fees and the amount we have found in this case to be such reasonable attorneys' fees. We therefore think that in equity and justice to both parties we are warranted in our holding aforesaid and in ending this litigation with a final decree in this court.

We do not deem it necessary to further discuss the questions of law presented by the parties to this suit. We simply hold that no constitutional rights of appellee, either under the State or Federal constitution, have been violated by our decision that appellee is liable to appellant in the sum of $108,055.78, and in addition thereto interest thereon at the rate of five per cent per annum from September 24, 1915, to the date of this decree. We simply conclude this part of the case by saying that the law of the case is fully stated in this and our former decision, when we add the further statement that we have recognized the law as settled by this court in numerous decisions that we will not disturb the findings of the master and the court below in a case of this kind, involving an accounting and consideration of numerous items in the accounting, unless such findings are shown to be manifestly against the weight of the evidence. This

court has plainly stated in the case of *Williams* v. *Lindblom*, 163 Ill. 346, that the findings of fact by the master are conclusive in such a case unless a clear mistake or fraud is shown. We have simply found in this case that the findings of the master and the circuit and Appellate Courts are clearly against the manifest weight of the evidence as to a number of items in the accounting.

The circuit court decreed that the receiver should pay one-third and the Central Trust Company two-thirds of the costs in the circuit court. The Appellate Court held that no part of the costs in the circuit court should be taxed against the receiver, on the ground that the litigation was made necessary by the wrongful acts of the Central Trust Company. Inasmuch as the receiver was entitled to a decree in the circuit court against the Central Trust Company, we think the Appellate Court rightly held that all the costs of the circuit court should be taxed against the Central Trust Company, but erred in modifying the decree of the circuit court and in holding that there should have been a decree against appellee in the sum of $978,029.11, including interest, and also erred in rendering judgment for costs against appellee in the Appellate Court.

The decrees of the circuit and the Appellate Courts are reversed for the reasons aforesaid and a decree is entered in this court against appellee and in favor of appellant in the sum of $108,055.78, with interest thereon at five per cent from September 24, 1915, to June 12, 1924, and for the costs in the circuit court. The costs in this court are to be paid by appellant.

*Decrees reversed and decree here.*